Ira S. MULLINS, Plaintiff,

v.

Julius MULLINS, John J. O'Connell, and Paul R. Dean, Trustees, United Mine Workers of America Health and Retirement Funds, Defendants.

Civ. A. No. 80–0323–B.

United States District Court,
W. D. Virginia,
Big Stone Gap Division.

April 21, 1982.

S. Strother Smith, III, Abingdon, Va., for plaintiff.

E. Calvin Golumbic, Gen. Counsel, UMWA Health & Retirement Funds, Washington, D. C., Stuart B. Campbell, Jr., Wytheville, Va., for defendants.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, District Judge.

Plaintiff, Ira S. Mullins, a former coal miner, brings this action against the Trus-tees of the United Mine Workers of America Health and Retirement Funds (herein-after referred to as "Fund"), seeking resto-ration of pension and health benefits which he alleges were improperly terminated by the Fund in 1980. The Fund has counter-claimed seeking to recover $26,015.00 paid to Mullins from November 1, 1968 through May 1, 1980 as pension benefits. The Fund also seeks to recover $2,199.88 paid to Mul-lins and his dependents from the UMWA 1950 Benefit Trust for health benefits from November 1, 1968 through October 2, 1980. The Fund contends that it paid plaintiff pension and health benefits through a mis-take of fact, and that it is accordingly enti-tled to be reimbursed. The Fund denies that the plaintiff is entitled to a miner's pension, and has previously denied the plaintiff's application for a disabled miner's health benefit on the ground that Mullins could not establish that he performed twen-ty years of classified service in the coal industry. Jurisdiction of this Court derives from § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a).[1] *Gordon v. ILWU–PMA Benefit Funds*, 616 F.2d 433 (9th Cir. 1980).

The Fund terminated Mullins' pension and health benefits when it was discovered that he had been given credit for doing classified work in the coal industry while he was employed at an aggregate plant owned and operated by Clinchfield Coal Company from sometime in 1959 until sometime in 1968. As stated in a brief filed by the defendants in this case, "[T]he employees at the aggregate plant facility did not produce any coal, and until 1968, did not work under the terms of the then effective coal wage agreement." The Fund discovered its "mis-take" when another miner applied for health benefits and was denied credit for his employment at the aggregate plant pri-or to May, 1968. The applicant complained

---

1. Title 29 U.S.C. § 185(a) provides:

   Suits for violation of contracts between an em-ployer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having juris-diction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

that plaintiff Mullins had been given credit for his aggregate plant employment, whereupon, the Fund reviewed Mullins' pension file and determined that he was not eligible to receive pension credit for his years of employment at Clinchfield's aggregate plant prior to May, 1968. The Fund terminated Mullins' pension benefits by a letter dated April 18, 1980, stating that his record reflected less than twenty years of classified service in the coal industry. Upon termination of his pension benefits, plaintiff instituted this suit, and the Fund's counterclaim ensued.

The facts in this case are basically undisputed. It is agreed that the plaintiff worked as a repairman for Dick Construction Company from August, 1947 through December, 1951, and that this constituted classified employment in the coal industry. In December, 1951, Clinchfield purchased Dick Construction Company and Mullins began his work for Clinchfield at their Lick Fork Mine until he was laid off in 1958. In the Fall of 1959, he began working at the aggregate plant as a repairman. Mullins continued to work until October 30, 1968, maintaining trucks, belt lines, and equipment. According to his testimony, he performed work of a similar type throughout Clinchfield's operations and did not work exclusively at the aggregate plant. Prior to ceasing work, Mullins filed an application for a pension which was ultimately granted. It is undisputed that Mullins was employed as a mechanical repairman from December, 1951 through September, 1968 by the Clinchfield Coal Company. Further, according to his undisputed testimony, he paid union dues to the United Mine Workers of America from December, 1951 through September, 1968, and was a member of Local Union 7950, District 28, United Mine Workers of America, commonly known as Dante Local. Finally, there is no question that, for a period from May, 1965 to May, 1968, an agreement was in effect between Clinchfield Coal Company and an organization called International Union of District 50, United Mine Workers of America. The contract constituted a separate agreement on behalf of the aggregate plant employees, District 50 being the bargaining agent for those persons working at the aggregate plant.

While there is not in this file any written agreement between Clinchfield and District 50 as to the other years in question, there is an affidavit, known as the "Head affidavit", in which the affiant states that, while he could not find any written agreement, he was of the opinion that District 50 was representing the employees of the aggregate plant prior to the agreement entered into in 1965 embracing the years relied upon by Mullins for pension qualification. It is agreed that a memorandum of understanding entered into between Clinchfield Coal Company and the employees of the aggregate plant, effective October 1, 1968, provided that employees of the aggregate plant would be considered members of the United Mine Workers of America until such time as a new contract was instituted in 1968.

After Mullins' pension was terminated, he requested a hearing. The hearing officer, after receiving evidence, determined that Mullins was employed at Clinchfield's aggregate plant from September, 1959 to his retirement on October 30, 1968. She further found that from September, 1959 through May, 1968, Mullins was working under the jurisdiction of District 50. Concluding that District 50 employment was not classified employment in the coal industry, the hearing officer determined that Mullins was not entitled to pension credit from September 24, 1959 to May, 1968, and had only 13½ years of classified employment credit. This represents the final decision of the Fund.

The question before this Court is whether or not the Fund has correctly interpreted the regulations and whether the opinion is consistent with law, or alternatively, whether the decision is not supported by substantial evidence or is arbitrary and capricious. Lengthy briefs have been filed on behalf of the plaintiff and the Fund, and much of the argument on both sides is devoted to the issue of whether or not Mullins was engaged in the production of coal.

Mullins contends that he was engaged in the production of coal because it was necessary that the slag or slate which was used in the production of the aggregate be removed or else all coal mining would cease. On the other hand, the Fund contends that the production of aggregate has nothing to do with the production of coal, and therefore is not covered by the Bituminous Coal Wage Agreement.

The ultimate decision in this case rests upon a construction of the pension plan which sets out the eligibility requirements for receiving pensions. The parties agree that the particular pension plan which applied to plaintiff Mullins is Resolution 63 which requires that an applicant have completed twenty years of service in the coal industry. Paragraph IIA defines a year of service as follows: "Worked as an employee in a job classified in the then existing coal wage agreement for an employer in the coal industry...."

■■ The Fund first argues that Mullins did not work for an employer in the coal industry. This contention appears to be somewhat ridiculous because the undisputed facts in this case show that from 1951 until 1968 plaintiff's sole employer was Clinchfield Coal Company, an employer in the coal industry. In fact, Clinchfield Coal Company was a signatory party to all Coal Wage Agreements with the United Mine Workers from 1950 through 1968.[2] Although the Fund argues that plaintiff's employer was the aggregate plant, the aggregate plant was not a person, a corporation, or a division. It was not a separate operation owned by Clinchfield. All of the employees at this plant were employees of Clinchfield the same as were the employees of Clinchfield from any other operation. Although words must be taken in their normal context, "employer" in the labor relations context has a much wider application than the narrow technical legal relation of "master and servant" in the common law. See N.L.R.B. v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed.2d 1170 (1944). In this context, an "employer" of an applicant under the pension plan is the person who pays him, hires him, and supervises him. In this case, Clinchfield Coal Company owned and operated the aggregate plant, paid Mullins, was involved in the coal industry, and was signatory to the UMWA Agreement. Consequently, there can be no question but that Clinchfield Coal Company was the "employer" of Mullins, as well as an "employer" in the coal industry. Therefore, the remaining question is whether or not the plaintiff was doing "classified work" for Clinchfield Coal Company. If he was doing "classified work", then he is entitled to credit for his pension. If he was not doing "classified work", he is not so entitled to a pension.

■ Turning then to the term "classified work", it is defined in the pension plan designated Resolution 63 as being a position covered under the Bituminous Coal Wage Agreement of 1950 and its successive amendments. Since the Coal Wage Agreements of 1958, 1964, and 1966 simply adopt the language of the Coal Wage Agreement of 1950, it is necessary only to look to the Coal Wage Agreement of 1950 to find a definition of "classified work". The pertinent portion of the Coal Wage Agreement of 1950 is under the title, "Exemptions Under This Agreement", and states, as follows:

It is the intention of this Agreement to reserve to the management and except from this agreement an adequate force of supervisory employees to effectively conduct a safe and efficient operation of the mines and at the same time, to provide against the abuse of such exemptions by excepting more such employees than are reasonably required for that purpose.

2. The parties have filed with the Court as Exhibit I the Wage Agreement of 1950. Exhibits J, K and L are the Coal Wage Agreements of 1958, 1964 and 1966, respectively. These are all of the wage agreements which are controlling in the years which are disputed for pension credit for Mullins. Although the Coal Wage Agreement for 1968 has not been filed, the Court does not consider that it would be of any significance. Finally, the Court will make reference to the 1974 Coal Wage Agreement, which has been filed, but which is unnecessary to the Court's opinion in this case.

Coal inspectors and weigh bosses at mines where men are paid by the ton, watchmen, clerks, engineering and technical forces of the operator, working at or from a district or local mine office are exempt from this agreement.

All other employees *working in or about the* mines shall be included in this agreement except essential supervisors in fact, such as: mine foremen, assistant mine foremen who, in the usual performance of their duties, make examinations for gas, as prescribed by law, and such other supervisors as are in charge of any class or labor inside or outside of the mines and who performed no production work.

The union will not seek to organize or ask recognition for such excepted supervisory employees during the life of this contract.

The operators shall not use this provision to exempt from the provisions of this agreement as supervisors more men than are necessary for the safe and efficient operation of the mines, taking into consideration the area covered by the workings, roof condition, drainage conditions, explosion hazards and the ability of the supervisors due to the thickness of the seam to make the essential number of visits to the working faces as required by law and safety regulations.

Record, Ex. I. (emphasis added). Therefore, except for the named persons above, all of the employees of any person who is a signatory to the Bituminous Coal Wage Agreement are included if the employees work "in or about the mines ...."

In light of the Coal Wage Agreement language, the Fund's argument that a person must be engaged in the production of coal to perform "classified work" under the pension plan is totally without merit. Any person who signs the UMWA contract has made all of their employees who work "in or about the mines ..." classified employees, except for those specifically exempted. To say that someone must be engaged in the production of coal to perform "classified work" under the contract is to read some-

thing into this contract that is noticeably absent.

In the past, similar claims have required this Court to construe the meaning of the word "classified" as used in the Coal Wage Agreements, and as incorporated in the various pension plans of the United Mine Workers Welfare and Retirement Funds. In *Boardwine v. Huge*, 497 F.Supp. 607 (W.D.Va.1980), the Funds denied pension benefits to a truck driver who did not work for a signatory coal operator. The Court pointed out that "classified work" does not signify work that a person has done for an employer who was signatory to the Wage Agreements. Rather, the term "classified work", as hereinabove set forth, includes all persons working in or about the mines, except those supervisory and administrative personnel specifically excluded. Since the truck driver worked in and about the mines, he was doing "classified work" within the meaning of the pension plan. It made no difference that he was not working for a signatory company or hauling signatory coal, only that he was working in and about the mines. *Id.* at 609.

Similarly, in this case, it makes no difference if Mr. Mullins belonged to more than one union. The critical question remains: what type of work did he do, and is it the type of work which would be contemplated as working "in or about the mines...?" There is no question in this case that the plaintiff was a dues-paying member of the United Mine Workers of America during all the years in question. Further, the plaintiff was working for an employer who was signatory to the agreement and an employer in the coal industry. However, most importantly, the plaintiff, Ira S. Mullins, was working "in or about the mines ..." of Clinchfield Coal Company within the meaning of the terms of the pension plan. Therefore, the determination that plaintiff did not have the requisite years of "classified service" under the plan was arbitrary and capricious.

The Court's conclusion is further borne out by reference to the Coal Wage Agreement of 1974, which for the first time con-

tains language indicating that a person must be involved in the production of coal. In the 1974 Agreement, language similar to that inserted in the 1950 Agreement indicates that "all other employees working in or about the mines shall be included in this agreement except essential supervisors in fact." However, the exemption clause is included under Section B, Article II of the Agreement which addresses scope and coverage. Section A of Article II refers to work jurisdiction, and reads as follows:

The production of coal, including removal of overburden and coal waste, preparation, processing and cleaning of coal and transportation of coal (except by waterway or rail not owned by the employer) repair and maintenance work normally performed at the mine site or at a central shop of the employer and maintenance of gob piles and mine roads, and work customarily related to all of the above shall be performed by classified employees of the employer covered by and in accordance with the terms of this agreement.

Section A continues to state: "Nothing in this Section will be construed to diminish the jurisdiction, express or implied, of the United Mine Workers."

Notably, the 1974 Agreement's definition of what constitutes production of coal incorporates many activities that are outside of any strict notion of the activities involved in the production of coal. These include work at a central shop, and of particular importance to this case, maintenance of gob piles. The court has been to the current Clinchfield operation and notes that it covers thousands of square miles. The central shop is many miles removed from any mining operation, yet, employees working in a central shop are deemed to be working in or about the mines.

Additionally, maintenance of gob piles, which is what the plaintiff was doing in this case, is mentioned as classified activity. A gob pile is defined in Webster's dictionary as "waste material produced in coal mining, consisting of clay, shale, etc." Exhibit 4 in the Record is a letter to George J. Titler, Vice-President of the United Mine Workers of America from Randolph E. Shelton who is an employee of Clinchfield. He states as follows:

A portion of the refuse material from the Moss 3 Preparation Plant is processed through an additional heavy media vessel where the lighter material is floated off back to the refuse circuit and the heavier sink material is recovered for use as raw feed for the lightweight aggregate plant. From the raw shale silo, the material is carried by belt conveyor to two 200-feet long rotary kilns where, during the course of the materials' passing through the kiln, it is heated to approximately 2000 degrees Fahrenheit. This burning removes all carbonation material and bloats or expands the pure shale with the resultant loss in weight by a volume of approximately one third.

Record, Ex. 4. Mr. Shelton further states that the shale from the Moss 3 Preparation Plant did not make a saleable product, though experimentation was carried on with quarrying different shale deposits in the area which did not prove practical. Facilities were installed to load shale into railroad cars at the Moss # 2 Tipple, which was transported to a siding at the Moss # 3 Tipple. The shale was then conveyed to and processed through the heavy media vessel installed for this purpose before ultimately moving to the lightweight aggregate plant for processing. Mr. Shelton proceeded to state because this was an experimental matter, there was no profit shown in the project until the year 1964.

Mr. Mullins testified that he worked as a repairman on the trucks and belt line to transport the shale from the various preparation plants to the aggregate plant. He also performed repair work on the plant equipment itself, and during this time, performed various other repair work as requested by Clinchfield in other mining processes. Although the Court cannot further embellish Mr. Shelton's description of the operation procedure of the aggregate plant, it seems obvious that all of the process is intimately involved with the production of coal. Operation of the aggregate

plant requires use of two huge tipples within the Clinchfield operation, and all of the aggregate operation is located on property of Clinchfield used in production of coal. No doubt, Mr. Mullins performed his work in and about the coal mines and for a coal company. However, the Court further concludes that removal of the gob piles, or the shale, is an integral part of the coal mining process, i.e., the production of coal. This conclusion is only reinforced by the pertinent language of the 1974 contract which treats "maintenance of gob piles" as work customarily performed by classified employees.

Lest there by any confusion, however, the Court does not hold in this case that a pension applicant's past work must have been an integral part of the coal mining process to be "classified work" under the 1950, 1958, 1964 and 1966 Coal Wage Agreements. Rather, it is only necessary that the applicant be employed by an employer in the coal industry, performing work in or about the mines, which is not explicitly excluded under the applicable Coal Wage Agreement as non-classified work. It matters not whether the employee has been a member of another union or if another union has been his bargaining agent, so long as he is still involved in "classified work".

■ Finally, the Court notes that the Pension Plan sets forth a contractual relationship between the Union and its members. However, each employee of an employer, signatory to the contract with the UMWA, is a third-party beneficiary of the Bituminous Coal Wage Agreement. Also, each member of the UMWA is a third-party beneficiary of that contract. It is undisputed in this case that in 1950 the plaintiff Mullins was an employee of Clinchfield and a member of the UMWA, therefore a third-party beneficiary of both sides of the contract. The 1950 Wage Agreement is clear that upon its effective date, "all *other* employees working in or about the mines shall be included in this agreement." The provi-

sion was intended to be broadly construed so that the UMWA could compel all employees of Clinchfield who were not supervisory personnel to be members of the UMWA. This same broad interpretation is expressed later in the 1974 Wage Agreement with language, "Nothing in this Section will be construed to diminish the jurisdiction express or implied of the United Mine Workers." This broad, liberal interpretation clearly expressed in the 1950 and 1974 Wage Agreements as it relates to the UMWA, must be equally construed as broadly and liberally to third-party beneficiaries. The Union cannot claim a broad interpretation for itself and a narrow construction for its members. It cannot be construed one way to force collections of dues and royalties and another way when it comes time to pay benefits to members.

Accordingly, the Court finds that Ira Mullins did classified work in or about the mines for an employer in the coal industry from 1959 to 1968. Therefore, summary judgment is granted to the plaintiff and denied the defendants on their counterclaim. An order will be so entered.