**CLINCHFIELD COAL CO., Plaintiff,**

v.

**DISTRICT 28, UNITED MINE WORKERS OF AMERICA, et al., Defendants.**

**Civ. A. No. 82–0314–A.**

United States District Court,
W.D. Virginia,
Abingdon Division.

Jan. 27, 1983.

Paul R. Thomson, Jr., Lebanon, Va., S.W. Zanolli, Ronald E. Meisburg, Washington, D.C., Forrest H. Roles, Charleston, W.Va., Louis Dene, Abingdon, Va., Hugh P. Cline, Norton, Va., Clinton W. Morse, Roanoke, Va., for plaintiff.

Gerald F. Sharp, Castlewood, Va., for defendants.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, District Judge.

Clinchfield Coal Company (hereinafter, Clinchfield) has filed this complaint against Local Union No. 1452, United Mine Workers of America and District 28, United Mine Workers of America (hereinafter, Union) seeking to vacate the award of arbitrator Robert J. Ables dated October 30, 1982 which became final and binding on December 15, 1982. This court has jurisdiction pursuant to Section 301(a), 29 U.S.C. § 185(a). In an amended complaint, Clinchfield has asked the court to stay the arbitrator's award pending the court's determination of this case. This petition to stay has not been ruled upon by the court, however in another proceeding, *McClure River Coal Co., Inc. et al. v. Clinchfield Coal Corp. et al,* Civil Action No. 82–0462–B, this court has temporarily enjoined both Clinchfield and the Union from enforcing the arbitrator's award. The Union has answered the complaint and also counterclaimed seeking enforcement of the Ables' arbitration award; back pay from December 15, 1982, costs and attorney's fees. Clinchfield and the Union have filed motions for summary judgment based on the pleadings and certain exhibits consisting of: Exhibit A, Typical Licensing Contract; Exhibit B, National Bituminous Coal Wage Agreement of 1981; Exhibit C, The Grievance; Exhibit D–1, Transcript of Hearing before Arbitrator Ables; Exhibit D–2, The Grievance (Union copy); Exhibit D–3, Clinchfield interoffice memo; Exhibit D–4, Map of Lower Banner Coal Seam; Exhibit D–5, another Licensing Contract; Exhibit D–6, various arbitrators' decisions interpreting previous contracts between BCOA and UMWA which contained the same language as the 1981 contract; Exhibit E, Ables' Decision and Award which is the subject of this suit.

On January 3, 1983, the court permitted McClure River Coal Co., Inc. and six other coal companies to intervene as plaintiffs in this case. These are the same parties involved in Civil Action No. 82–0462–B, who were granted a temporary injunction preventing Clinchfield and the Union from enforcing the Ables' arbitration award. These intervenors aver in their complaint that they are producing coal on land belonging to Clinchfield; that they are signatory to the National Coal Wage Agreement of 1981; that their employees are dues-pay-

ing members of the Union; that if the Ables' arbitration award is enforced, they will be driven out of business; that if the Ables' decision becomes precedent (and it has been followed by another award by arbitrator Nicholas of similar import) their employees who are UMWA members will lose their jobs. They also complain that they were not parties to, and that neither they nor their employees were permitted to be heard in the Ables' grievance proceedings, despite the fact that they were directly affected. They ask that the Ables' award be vacated and that Clinchfield be deemed to have not violated the BCOA–UMWA contract of 1981. On the other hand, they allege that if Paragraph IA(h) of the Contract means what arbitrator Ables has held it to mean, Clinchfield and the Union have violated the Sherman Anti-Trust Act.

On January 4, 1983, the court permitted Golden Chip Coal Co. and 38 other coal companies to intervene as plaintiffs. These intervenors have filed a complaint, affidavit and motion for summary judgment and a brief in support thereof. These parties aver that if the Ables' arbitration award is implemented, it must be done by terminating or suspending some or all of its contracts with these intervenors who employ 984 employees, of which 845 are members of the Union. They also aver that neither they nor their employees were parties to the grievance processed by arbitrator Ables, and that no consideration was given to them, either by the Union or the arbitrator. They further aver that the Clinchfield employees who are now laid off have recall rights, (and indeed many have been recalled to work) but, if their contract is cancelled, it means bankruptcy for them and no recall rights for their employees. These intervenors allege that arbitrator Ables' award should be vacated for some of the same grounds as alleged by Clinchfield, and in addition, they say that the Union is guilty of unfair representation by choosing to represent some of its members to the detriment of others, that they have standing in this court to raise this issue on behalf of their employees, and the award should be vacated on this ground.

Westmoreland Coal Company and Consolidation Coal Company, companies which also lease land to independent coal operators, have also been permitted to intervene in this suit as *amici curiae* because they are beset with layoff problems due to the economy and have Union employees in the same category as the grievants in this case.

## THE GRIEVANCE; THE CONTRACT PROVISION; THE AWARD

On June 3, 1982, Jack R. McCrady filed a grievance in accordance with established procedure of the National Bituminous Coal Wage Agreement of 1981, as a laid-off employee of Camp Branch # 1 Mine of Clinchfield, and as a class action alleging a violation of "Article 1, IA in that they have *leased out their coal lands* in a manner which has *resulted* in the lay-off of their employees . . . ."

At the hearing before arbitrator Ables, the Union specifically alleged that Clinchfield had violated Article IA Section (h) titled "Leasing, Subleasing or licensing out of Coal Lands" as follows:

The Employers agree that they will not lease, sublease or license out any coal lands, coal producing or coal preparation facilities where the purpose thereof is to avoid the application of this Agreement or any section, paragraph or clause thereof.

Licensing out of coal mining operations on coal lands owned or held under lease or sublease by any signatory operator hereto shall not be permitted unless the licensing out does not cause or result in the layoff of Employees of the Employer.

At the outset of the hearing, the Union stipulated that Clinchfield had not violated the first paragraph of Section IA(h). As the court hereinafter sets forth, the grievants at that time stipulated themselves out of court since the grievance charges Clinchfield "leased out their coal lands." It does not charge them under the second paragraph of "licensing out coal mining operations." Even if it did so allege, there is no

evidence in the record that Clinchfield "licensed out coal mining operations."

The award in this case, to put it mildly, is astounding and confusing. Mr. Ables recites that the mine at which McCrady, et al. worked was permanently shut down and that there were no jobs for them to return to after stating: "There are difficult, practical and economic problems involving the Union's recognition that the *practice of leased mines* on this property goes back at least 20 years." Arbitrator Ables devotes three pages of his opinion debating whether Clinchfield leases or licenses its land and concludes that it is a license. However, in his award, he refers to them as "leased mines." He never discusses the distinction between "coal lands" and "coal mining operations." After finding that Clinchfield violated the contract, Mr. Ables says: "As a result of the violation, the company shall offer comparable jobs to each of the grievants...."

Thus, the arbitrator has ordered Clinchfield to give the grievants (all members of the class) a job, without determining whether such a job exists, or must be created, or results in some other person losing his job. Neither Clinchfield, nor the Union, nor the intervenors, nor this court, are able to read Mr. Ables' mind.

## THE ISSUES

Because of the effect of the relief ordered by the arbitrator, many issues are raised in this case, which may not be issues at all if the arbitrator's remedy was clear. The defendants point out that in previous such cases, this court has remanded cases to the arbitrator to explain the remedy. Due to the far-reaching effect of this opinion on the entire coal industry, the court is reluctant to do this. Therefore, a summary of the issues raised in this case is as follows:

(1) The award does not draw its essence from the labor agreement because:

   a. Ables failed to address portions of Article IA(h), first paragraph;

   b. Ables misinterpreted and misconstrued Article IA(h), second paragraph;

   c. Ables did not consider the history of Article IA(h);

   d. Ables did not consider properly prior decisions of arbitrators, including the Three Member Arbitration Board;

   e. Ables did not consider the "law of the shop;"

   f. Ables did not comply with undisputed evidence in the case.

(2) The award is so vague, ambiguous and unclear as to be unenforceable.

(3) The burden of proof was put on Clinchfield rather than the grievant contrary to established law and precedent.

(4) The award is arbitrary and capricious because Ables found that profit considerations and economic considerations are not to be considered in construing a labor agreement.

(5) The award compels Clinchfield to cancel contracts with independent contractors, therefore, it is illegal in that it violates Sections 8(b)(4)(B) and 8(e) of 29 U.S.C. §§ 158(b)(4)(B) and 158(e).

(6) Clinchfield must reopen Camp Branch No. 1 Mine, or open new mines or expand existing operations or cancel the agreement which violates 29 U.S.C. § 158(b)(4)(B) and § 158(e).

(7) The award is contrary to public policy.

(8) The award requires Clinchfield to assign work from one class and give the work to another class in violation of 29 U.S.C. § 158(b)(4)(D).

(9) The award requires all people, regardless of seniority, to be given jobs, regardless of replacing others of greater seniority, in contract employment; therefore, it violates Article XVII of the Labor Agreement.

(10) The award requires the reopening of new mines, or expand existing operations, thus, it violates management rights recognized by Article 1, IA and XVII of the labor agreement.

(11) The award construes the agreement in such a manner as to cause Clinchfield and UMWA to breach anti-trust laws.

(12) The award was obtained by undue means, by unfair representation.

## FACTUAL SUMMARY

Clinchfield has regularly and continuously leased or licensed coal lands since 1947 and in 1982 fifty-four contract deep mines on six surface contracts were operating. Prior to May 1982, Clinchfield had 15 company mines employing approximately 2100 employees. On May 22, 1982, according to the Union, Clinchfield laid off 634 of its employees, by closing completely six mines, with partial lay-offs at two other mines. The class action grievance in this case was filed by Local Union 1452, by the employees of Camp Branch No. 1 Mine. According to Clinchfield its present operations consist of twelve deep mines, three preparation plants, four raw coal shipping docks, a central warehouse, a central shop and a central laboratory. The contract mines, according to undisputed testimony, are located on small, isolated coal deposits and all were in existence prior to the time this dispute arose, and all except one of these mines are on lands never before mined. The contract mines' employees are UMWA members who belong to locals other than No. 1452. The contract mines over the years have produced approximately fifty percent of the coal Clinchfield sells to its customers and there is no evidence of change in this production ratio since the lay-off. The contract mines produce more coal than Clinchfield's at less cost and therefore can be said to subsidize marginal company mines. As a result of a depressed national economy in April 1982, as prices fell and stockpiles grew, Clinchfield found it necessary to cut costs to survive the crisis and therefore shut down its least efficient, least profitable operations. Camp Branch Coal seam was four to nine feet high but in 1982, the remaining coal was 32 to 34 inches. Also, because of age, it was a large mine in area and had more costly maintenance. Due to cost of producing coal at Camp Branch, it would have had to be closed, due to the economy, had there been no contract mines, according to uncontradicted testimony.

## THE LAW

■ In *The Steelworkers Trilogy,* three decisions of the U.S. Supreme Court rendered the same day, courts were admonished not to tamper with arbitrators' awards unless the arbitrator had exceeded the jurisdiction of the agreement. Jurisdiction is exceeded where the award is not drawn from the "essence" of the agreement. *United Steelworkers of America v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. American Manufacturing Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1961). Various tests have been used by courts in construing this "essence" standard. Thus, an award that contravenes federal law exceeds the arbitrator's authority. *World Airways, Inc. v. International Brotherhood of Teamsters,* 578 F.2d 800 (3d Cir.1978). So, also, an award may be invalid where there is misconduct or infirmities in the arbitration proceeding. *Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Western Pennsylvania Motor Carriers Association,* 574 F.2d 783 (3d Cir.1978); "palpably faulty," *Electrical Workers v. Peerless Pressed Metal Corporation,* 489 F.2d 768, 769 (1st Cir.1973); "lacks foundation in reason and fact," *Machinists Dist. No. 145 v. Madison Air Transportation, Inc.,* 495 F.2d 1241, 1244 (5th Cir.1973); "arbitrary, capricious," *Newspaper Guild v. Tribune Publishing Co.,* 407 F.2d 1327, 1328 (9th Cir.1969).

This court has employed two intertwined tests stated as follows:

(1) An award cannot be contrary to the express language of the agreement, and, (2) an award will not be enforced if there is no rational way the arbitrator's interpretation can be construed from the agreement.

*Keen Mountain Construction Company, Inc. v. Chambers,* 481 F.Supp. 532 (W.D.Va. 1979); *Local Union 1470 v. Clinchfield Coal Co.,* 483 F.Supp. 1302 (W.D.Va.1979).

Since this court is of the opinion that arbitrator Ables exceeded his jurisdiction under each of the two foregoing tests, it is not necessary to consider the alleged federal law violations set forth by Clinchfield and various other alleged errors in the award.

The court is of the opinion that arbitrator Ables did not draw his opinion from the "essence" of the agreement in at least three important respects, either one of which would justify this court's vacating the award. These three particulars will be discussed separately as follows: (1) the history of the disputed clause was not properly considered; (2) the arbitrator ignored or overlooked and completely failed to interpret the words "coal mining operations;" and, (3) there is no rational way to justify the arbitrator's interpretation of the phrase "unless the licensing out does not cause or result in the layoff of employees of the employer;" and furthermore, there is no rational way to support his decision under the facts of this case under any of the three particulars.

### HISTORY

■ Unfortunately, arbitrator Ables' rulings prevented the parties from pursuing the complete history of the second paragraph of Article I Section (h). From page 79 through page 87 of the transcript of the hearing, Clinchfield tried to show that in the 1981 negotiations on the contract, the Union membership voted down a contract by a two to one margin which contained the express language which the Union is now seeking as their interpretation of the present agreement. Mr. Pendergast, for Clinchfield, stated "what the Union is asking for in this grievance is part of that proposed contract, and they rejected; that is what I'd like to put in evidence." (p. 80) Mr. McCrady, for the Union: "Well, this looks to be what we voted on the first time which we voted down 2–1." (p. 81) Despite this, Ables did not permit it to be in the record.

In this same colloquy, Mr. McCrady speaking for the Union, stated at page 84,

"I know there was quite a dispute over the *Amax Coal* decision at the time which had to do something with trucking. I've got a copy of it. I don't have the law education to understand the wherefores." Again, Ables did not pursue the obvious reference to the fact that the *Amax Coal* case caused a change in Article I, Section (h). Thus, while the evidence does not show the reason, the record in this case discloses that in the formation of the 1981 contract, the second paragraph of Article I, Section (h) was changed. By reviewing Exhibit D–6 (Prior Arbitrators' Decisions), it can readily be seen that the exact language in the 1981 contract appeared in the 1974 and 1978 contracts. Thus, the following is the complete Article, Section (h) of the 1974 and 1978 contracts and the lines which are underlined are deleted in the 1981 contract:

Licensing out of coal mining operations on coal lands owned or held under lease or sublease by any signatory operator hereto shall not be permitted unless *the work involved is performed by members of the United Mine Workers of America in the manner and to the extent permitted by law and that* the licensing out does not cause or result in the layoff of Employees of the Employer; *provided however, that either the licensor or licensee, leasee or subleasee makes the appropriate payments provided by this agreement to the United Mine Workers of America Health and Retirement Fund and otherwise abide by the terms of the agreement.*

To summarize, the crucial language in the 1981 contract has been, *in toto,* unchanged since 1974.

Exhibit D–6 is a group of arbitrators' decisions construing the identical language of the 1981 contract in the 1974 and 1978 contracts. The Union was unable to produce a single prior arbitrator's decision which upholds its position in this case. A total of sixteen arbitrator's decisions are in Exhibit D–6. Furthermore, many of these decisions were appealed to the Arbitration Review Board, a board consisting of one Union member, one company member, and

a third member selected by the other two. All the Review Board's decisions are unanimous.

A decision of arbitrator Beckman on August 11, 1978, referring to the second paragraph of Section (h) states as follows:

[T]he licensing out does not cause or result in the layoff of employees of the employer. In my opinion, the original licensing out here did not cover the layoff in question .... Section (h) is not designed to guarantee work when economic conditions depress the need for full production.

In a decision of arbitrator Blackwell, dated July 9, 1980, he states:

The company's use of coal from its licensees could be found violative of the agreement provided there is a causal connection .... The evidence does not establish this connection [even when] the licensing out occurred four and one-half months before the lay-off ..., but more important the evidence reflects that Mines 3 and 4 had been in operation since 1913—67 years ... efficiency consideration led to management's decision to close ... it cannot be proved that there was a causal connection.

On April 15, 1977, arbitrator Beckman, in an opinion states with regard to paragraph 2, section (h):

The foregoing language is designed to prohibit licensing where the purpose of the same is to avoid the application of the agreement. Licensing or leasing for other business reasons is not prohibited. To make a case against the company the grievant must prove that the licensing or leasing caused his lay-off ... proving lay-off alone is not sufficient. In other words, it is possible to be laid off for an economic reason unrelated to the fact of licensing or leasing.

The history of Clinchfield's licensing out coal lands and the history of the Union's attitude toward it, in this case, is graphically illustrated in the following dialogue between arbitrator Ables and John Kennedy, District UMWA President:

Ables: You're talking about the second paragraph of Section (h) in Article I, right?

Kennedy: Right.

Ables: It seems to talk prospectively to the future, 'licensing out' and the operative phrase 'shall not be permitted' suggests that the prohibition if it is to apply is to the licensing out of coal mine operations prospectively, in the future, 'unless the licensing out does not cause or result in the layoff of employees of the employer.' Now, if I understand you, at the time the company did contract out operations to the various contractors, the Union did not feel the company had violated this provision of the agreement. Is that right?

Kennedy: Well contract mines in this area, part of the country, has been around 20 years or maybe more. This has been a procedure that Clinchfield Coal Company, in particular, has used to mine coal for a long time. This was not something new; this has been here a long time. Whether or not the Union made any objection I can't tell you. I wouldn't in on it .... It is something that was here when I came.

(Pages 104–06).

Thus, the history of the second paragraph of subsection (h) shows that it has been in the contract in the same words since at least 1974 (probably before). Clinchfield and other companies have licensed out coal lands for at least 20 years, (according to Clinchfield, for 35 years) with no objection by the Union. Union and company representatives and independent arbitrators have steadfastly interpreted this paragraph contrary to the Ables' decision. The parties have been negotiating under these conditions for many months, relying on past interpretation of words and past actions of the parties, only to have this reliance swept away by the pen of arbitrator Ables.

Mr. Ables, on page 2 of his opinion, states as follows:

The parties did not give an historical account of the development and application of the coal *leasing* provisions of Article IA(h).

This court finds, however, that the parties attempted to explain the historical development, to no avail, since Mr. Ables chose to ignore their explanation.

On page 18, arbitrator Ables says: "Arguments based on need for profit are irrelevant." Thus Ables says that economic motives do not justify closing a mine, even one that is losing money. The company is required to furnish a job even if it loses money in the process. Therefore, Ables says: economics does not justify a mine closure; the burden of proof is on the employer; and, the employer has not sustained the burden if he lays off employees to make a profit or simply cut his losses. If such reasoning of Ables ever becomes law, collective bargaining would be greatly hampered because no one could rely upon the clear previous meaning given to simple words of the English language. Also, if arbitrators shift the burden of proof by whim from one party to the other, then arbitration may lose its appeal as a means of settling disputes. The Ables' opinion is, therefore, historically not in accord with the essence of the bargaining agreement.

## COAL MINING OPERATIONS

Arbitrator Ables begins his opinion with the following dramatic language: "The Union calls them 'captive' mines. The employer does not take issue with the adjective, 'Them' is leased lands."

On page 12 of the opinion, Ables acknowledges that one of four arguments made by Clinchfield is that it has not licensed out any "coal mining operations." Having recognized the issue, he never addresses it. Thus, the decision of the arbitrator in effect holds that the words "coal lands" in paragraph one of Section IA(h) is the same as "coal mining operations" in paragraph two.

Arbitrator Ables correctly interprets the "contracts" on file in this case as "licensing" agreements. Clinchfield employees testifying in this case identify them as "licenses;" they raise no issue on this point in argument before the arbitrator, and concede the same in their brief before this court. Having spent several pages deciding these contracts are "licenses" rather than "leases," Ables never discusses *what* is licensed. While the word "license" has a meaning, so does the word "operation." As this court has pointed out previously, all words in these contracts have special meaning to the parties. For example, "employee," "employer," "classified," "in and around the mines," "signatory," and many others have grown over the years by interpretation to have special meaning. See *Mullins v. Mullins,* 537 F.Supp. 840 (W.D. Va.1982). An examination of these "licenses" reveals that the contractors are given the right to mine and remove coal from seams of coal which Clinchfield owns or has under lease. The relationship of the parties is specifically set out as owner and independent contractor. The evidence in this case, according to the arbitrator, is that in all of these contracts the independent contractor was mining from land not previously mined, except in one case. Therefore, in the literal sense, Clinchfield could not and did not license an on-going "operation."

It is apparent from Article IA Section (f) entitled "APPLICATION OF THIS CONTRACT TO THE EMPLOYER'S COAL LANDS" that the contracting parties were aware of the literal distinction between naked coal lands and coal mining operations. This provision states as follows:

> This agreement covers the operation of all coal lands, coal producing and coal preparation facilities owned or held under lease by them .... This section will immediately apply to any *new operations* upon the Union's recognition, certification, or otherwise properly obtaining bargaining rights. Notwithstanding the foregoing, the terms of this agreement shall be applied without evidence of Union representation of the employees involved to any relocation of an operation already covered by the terms of this agreement.

Section (f) therefore binds the employer to continue to have Union representation if the employer relocates a coal mining operation, but if a new operation is begun by an employer, the agreement is not in effect

until the Union has obtained bargaining rights; whereas, section (h) carries the agreement one step further and requires an employer to maintain jobs for its employees when it licenses out coal mining operations. Reading these sections as a whole, they cover all of an employer's operations and its subsidiaries' and affiliates' operations, but nowhere is it specified that it applies to *operations* of independent contractors of the employer.

All collective bargaining agreements between BCOA and the UMWA are not conceived in a vacuum; each side has lawyers scrutinizing every word in light of old interpretations. It makes no sense that the UMWA would seek to preserve the jobs of one group of Union members as opposed to Union members working for another company.

■ Since Clinchfield has not licensed out "coal mining operations" it has not violated Article IA Section (h), second paragraph. Further, the arbitrator never decided this issue. Therefore, the award is not "final." *Puerto Rico Maritime, etc. v. Star Lines Ltd.,* 454 F.Supp. 368 (S.D.N.Y.1978), 5 Am.Jur.2d *Arbitration and Awards* §§ 136, 141, 142 (1962). The award being incomplete it will not be enforced. *Bell Aerospace Co. Div. of Textron v. Local 615 Int. Union, etc.,* 500 F.2d 921, 923 (2nd Cir.1974).

## CAUSE OR RESULT

Arbitrator Ables has not only improperly held that the defendant has the burden of proof in an arbitration hearing where lay-offs are involved, but has also misinterpreted "cause or result." In cases involving disputes between mines and Trustees of UMWA Pension Fund, regarding disability, one of the tests is that the disability must be "as the *result* of a mine accident." In a publication entitled *Guidelines For Approval of Disability Pensions,* it is stated "disability shall be deemed to be the *result* of a mine accident in accordance with the principle of proximate cause." Accordingly, this court, in labor law cases, has interpreted "cause" and "result" as synonymous terms

construed as proximate cause. *Church v. Huge,* 500 F.Supp. 133, 136, 137 (W.D.Va. 1980). In all the arbitrators' decisions filed in this case prior to the Ables' award, (Exhibit D–6) the arbitrators deemed the words "cause or result" as meaning proximate cause. Two arbitrator's awards, Sargent and Kennedy, dealing with this same 1982 Clinchfield lay-off, interpret Article IA(h) second paragraph, under the principles of proximate cause. Proximate cause is defined in many ways and is in itself widely misconstrued. A common synonym is "efficient cause." In a given event, it is usually easy to point to numerous things, which had they not occurred, the event would not have occurred. For example, suppose a person has a diseased heart, and another person strikes him over the heart with his fist resulting in death to the victim. Is the bad heart or the blow, the proximate cause of the death?

In 57 Am.Jur.2d, *Negligence* § 143 (1979), it is stated:

Where there are intervening causes, the proximate cause is the efficient cause—the one that sets the other causes in operation. The causes that are merely incidental, or instruments of a superior or controlling agency, are not the proximate cause and the responsible ones, although they may be nearer in time to the *result;* it is only *when causes are independent of each other* that the nearest is to be charged with the disaster.

■ Thus, an act is a proximate cause when it is the last or one of the last acts of a series of events which resulted in the event, but for which the event would not have occurred. While the foregoing is tort law, principles of contract are in accord. Thus, here, the licensing out of coal lands is an independent event, having occurred several years prior to the lay-offs, but the proximate cause is the widespread economic conditions of 1982 which have caused Clinchfield to shut down its most expensive, least productive operations.

■ In *United Steelworkers v. Warrior & Gulf Navigation Co., supra* at 581–582, the

Supreme Court stated: "The industrial common law ... the practices of the industry and the shop ... is equally a part of the collective bargaining agreement although not expressed in it." The evidence in this case is undisputed that the prior customs and practices, past arbitral decisions and all past relationships of the parties have considered "cause or result" to require a finding of direct, immediate relationship between a specific act and a specific result.

## UNFAIR REPRESENTATION

Some of the intervenors (contract companies) contend the arbitrator's decision should be vacated because of unfair representation by UMWA. It is argued that the direct result of attempting to put certain UMWA members back to work is the loss of jobs of another group of UMWA members (employees of the contractors). Thus, the Union has (1) discriminated against segments of its membership; (2) it has not acted in good faith and honesty because it did not even advise its other members of the adverse action or make them parties to the proceeding; and (3) the Union was guilty of arbitrary conduct when it presented the harm done to one group of Union employees, without pointing out the harm to the other group, therefore, leading arbitrator Ables to conclude that the employees of the contract mines were "sick, sore, lame, disabled or retired." *See Griffin v. Int. U. United Automobile, A & AIW*, 469 F.2d 181 (4th Cir.1972). Clearly, the Union, in this case is a house divided and the various employers should be concerned about this because these conditions do not lead to stable industrial relations, where there are opposing factions within the UMWA. There is authority for vacating an arbitration award where a non-participant is bound by the Union's unfair representation. *Smith v. Hussman Refrigeration Company*, 619 F.2d 1229 (8th Cir.1980). However, the UMWA is structured in such a way that its Districts and Locals have certain elements of autonomy. Here, the arbitration proceedings are brought by a District and a Local of the UMWA with the tacit approval of the International. If these internal workings of the Union provide a means to self-destruct, it would appear to be the concern of Union membership, rather than their employer. Certainly, by now, these affected Union members know what is going on and could have individually or collectively intervened in this suit. Therefore, while the Union may be guilty of unfair representation, this court is of the opinion that the intervenors do not have standing to raise this issue.

## CONCLUSION

For reasons stated herein, an Order will be entered vacating the award of arbitrator Ables.

The Clerk of this court is directed to send certified copies of this Memorandum Opinion to counsel of record.