CLINCHFIELD COAL COMPANY, et al., Appellees,

v.

DISTRICT 28, UNITED MINE WORKERS OF AMERICA & LOCAL UNION # 1452, Appellants,

Westmoreland Coal Company, Amicus Curiae.

No. 83–1147.

United States Court of Appeals, Fourth Circuit.

Argued July 11, 1983.

Decided Nov. 3, 1983.

Rehearing Denied Dec. 15, 1983.

Gerald F. Sharp, Castlewood, Va. (Peter Mitchell, Alexandria, Va., on brief), for appellant.

Ronald E. Meisburg, Washington, D.C. (S.W. Zanolli, Smith, Heenan, Althen & Zanolli, Washington, D.C., Paul R. Thomson, Jr., Roanoke, Va., Louis Dene, Abingdon, Va., Forrest H. Roles, Charleston, W.Va., Hugh P. Cline, Carl E. McAfee, Cline, McAfee & Adkins, Norton, Va., on brief), for appellees.

Clinton S. Morse, Woods, Rogers, Muse, Walker & Thornton, Houston, Tex., Scott L. Messmore, F. Thomas Rubenstein, Big Stone Gap, Va., on brief, for amicus curiae.

Before PHILLIPS, SPROUSE and ERVIN, Circuit Judges.

ERVIN, Circuit Judge:

The United Mine Workers of America and Local Union No. 1452 (hereinafter collectively referred to as the "Union") appeal from the United States District Court for the Western District of Virginia wherein summary judgment was granted in favor of Clinchfield Coal Company and intervening coal companies (hereinafter collectively referred to as "Clinchfield") against the Union. Clinchfield brought this action to vacate an arbitrator's award on a grievance filed by the Union against Clinchfield. Because we agree with the district court that the arbitrator's award did not draw its essence from the labor agreement, we affirm.

## I.

Clinchfield is the owner and lessee of coal lands in southwestern Virginia. Clinchfield operates twelve large underground mines, three preparation plants, and four raw coal-loading facilities.

Clinchfield also licenses coal lands to independent contractors. Although the licensees sell all coal mined to Clinchfield, they nevertheless conduct their own independent coal mining operations. The licensees hire and supervise their own employees, set production schedules, and own or rent the necessary machines, equipment, and tools. Clinchfield's assistance is limited to making available on a cost reimbursable basis electricity, access roads, and engineering services.

The licensed lands contain small, isolated, remote pockets of coal. Clinchfield itself will mine only those coal lands that contain sufficiently large seams of coal to justify large underground mining operations which require extensive machinery, material, staff, and commitment of capital. Clinchfield has licensed out coal lands since the 1940's and currently has 54 such licenses outstanding. Of those 54, only one parcel had previously been mined by Clinchfield.

The yearly amounts of coal mined by the licensees and by Clinchfield's own mines generally have been roughly equal. Since the licensees' mining operations have been more efficient than Clinchfield's mines,

Clinchfield has, in effect, subsidized its less efficient mines by obtaining cheaper coal from the licensees. So long as the demand for coal remained high, this pattern of subsidization continued.

In April, 1982, the demand for coal sharply declined, a downturn that was expected to be long term. The decline was accompanied by falling coal prices. In response to the need to cut production and costs, Clinchfield shut down its least efficient mines. Among the closed mines was the Camp Branch No. 1 Mine ("CBM"), an old and costly mine.

CBM was closed on May 22, 1982, requiring the layoff of Union members. In effectuating the layoff, Clinchfield was bound by the provisions of the National Bituminous Coal Wage Agreement of 1981 (the "Agreement"), to which Clinchfield is a signatory.

On June 3, 1982, the Union filed a grievance against Clinchfield under the Agreement, alleging a violation of ¶ 2 of article 1A(h) of the Agreement. Paragraph 2 provides:

> Licensing out of coal mining operations on coal lands owned or held under lease or sublease by any signatory operator hereto shall not be permitted unless the licensing out does not cause or result in the layoff of Employees of the Employer.

Clinchfield denied the grievance and the matter was submitted to arbitration before Arbitrator Robert J. Ables.

On October 30, 1982, Arbitrator Ables rendered his decision sustaining the Union's grievance. The arbitrator held that Clinchfield had the burden of proving that its licenses did not cause the layoffs at CBM, a burden that was not carried by irrelevant evidence concerning the decline in demand for coal and the resultant economic nonviability of CBM. Arbitrator Ables thus ordered CBM to put the grievants back to work.

Clinchfield then filed this action to vacate the arbitrator's award and on January 27, 1983, the district court entered an order vacating the award, 556 F.Supp. 522. This appeal followed.

## II.

■ Federal courts are empowered by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to review the decisions of labor arbitrators. That review is limited. In *The Steelworkers Trilogy,* the courts were admonished that "[t]he refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements." *United States Steelworkers of America v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). "[S]o far as the arbitrator's decision concerns construction of the contract [i.e., labor agreement], the courts have no business overruling him because their interpretation of the contract is different from his." *Enterprise Wheel,* 363 U.S. at 599, 80 S.Ct. at 1362. Nonetheless, the award must "draw its essence" from the collective bargaining agreement.

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources; yet his award is legitimate *only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.*

*Id.* at 597, 80 S.Ct. at 1361 (emphasis supplied). Furthermore, "the arbitrator must take into account any existing common law of the particular plant or industry, for it is an integral part of the contract." *Norfolk Shipbuilding and Drydock Corp. v. Local No. 684,* 671 F.2d 797, 799–800 (4th Cir. 1982).

The district court held that Arbitrator Ables's award did not "draw its essence" from the Agreement because the arbitrator (1) "ignored or overlooked and failed to interpret the words 'coal mining operations'" as used in ¶ 2 of article 1A(h), (2) improperly disregarded Clinchfield's evidence of an economic cause for the layoffs, and (3) erroneously placed the burden on Clinchfield to show that the licenses did not cause the layoffs. Because we agree with the first two of these criticisms, we likewise conclude that the award did not draw its essence from the Agreement.

### A.

At the outset of the hearing before Arbitrator Ables, the Union stipulated that it was alleging a violation of only ¶ 2, and not ¶ 1, of article 1A(h) of the Agreement. Paragraph 2 enjoins licenses of "coal mining operations" that result in layoffs. This is to be compared with ¶ 1's prohibition of licenses of "coal lands" where the purpose thereof is to avoid the application of the Agreement.[1] The parties now do not dispute that the challenged transactions are licenses. Instead, they dispute whether Arbitrator Ables determined that there had been licenses of "coal mining operations." Clinchfield claimed before the arbitrator that it had licensed only "coal lands" and not "coal mining operations."

The district court found that Arbitrator Ables neither discussed nor decided the issue of whether "coal mining operations" or "coal lands" were licensed. The district court also reasoned that the terms had special legal meanings to the parties and that "the contracting parties were aware of the literal distinction between naked coal lands and coal mining operations." The district court further found that Clinchfield had not licensed out any ongoing coal mining operations; rather, Clinchfield licensed coal lands that, with one exception, had not been previously mined, to independent contractors who had to initiate their own coal mining

---

1. The Union also stipulated that Clinchfield did not violate ¶ 1. Since all the licensees are signatories of the Agreement, the licenses presum-ably were not made to avoid application of the Agreement.

operations. Since there was no license of coal mining operations, the district court concluded that the award did not draw its essence from the Agreement.

The Union responds on appeal by noting that Arbitrator Ables was aware of the "coal mining operations or coal lands" issue because he listed it as one of the four questions raised by Clinchfield. The Union then argues that "[h]aving stated the company's position, it is clear by virtue of his award that he rejects it, although his decision does not develop his reasons in detail." The Union thus charges the district court with overstepping the limited review authorized in the *Steelworkers Trilogy:* "under the argument of lack of satisfactory discussion by the arbitrator, [the court] substituted its view for that of the arbitrator."

■ The Union's argument is wholly unsatisfactory for it would allow an arbitrator to shield his award simply by the ruse of stating an issue without discussing it. Furthermore, in this case, the undiscussed issue concerns the operative clause of ¶ 2. Indeed, it seems that a reasonable interpretation of that clause might require a contrary result. Where, as here, the arbitrator fails to discuss critical contract terminology, which terminology might reasonably require an opposite result, the award cannot be considered to draw its essence from the contract.

### B.

At the hearing before Arbitrator Ables, Clinchfield presented substantial evidence that the proximate cause of the layoffs at CBM was the April, 1982 decline in the demand for coal. Arbitrator Ables, however, disregarded that evidence, stating that "[a]rguments based on need for profit are irrelevant" and that layoffs cannot be justified by the need "to make profit or simply ... cut losses." The district court found that Arbitrator Ables, in so doing, ignored the history of ¶ 2, as evidenced by the consistent approach taken by other arbitrators to evidence of an economic proximate cause, independent of licensing, for layoffs. It has been held, for example, that

¶ 2 "is not designed to guarantee work when economic conditions depress the need for full production," *Russel Fork Coal Co. and Local 8338 (Dist. 30),* No. 78–40–78–57 (Beckman, August 11, 1978), or where "efficiency consideration [sic] led to management's decision to close," *Connelton Industries and Local 6029 (Dist. 29),* No. 78–29–80–457 (Blackwell, July 9, 1980). As Arbitrator Beckman stated:

> Licensing or leasing for ... business reasons is not prohibited. To make a case against the company the grievant must prove that the licensing or leasing caused his lay-off.... [P]roving lay-off alone is not sufficient. In other words, it is possible to be laid off for an economic reason unrelated to the fact of licensing or leasing.

*Carbon Fuel Co. and Local 6572 (Dist. 17),* No. 17–77–925 (Beckman, April 15, 1977). The district court concluded that Arbitrator Ables thus disregarded the "common law of the ... industry," which "is an integral part of the contract," *Norfolk Shipbuilding,* 671 F.2d at 800, and thereby strayed from the essence of the Agreement.

The Union responds that the arbitrator simply enforced what the parties bargained for and criticizes the district court because it "seems to find the bargain too good for the Union and has written it out of the agreement by vacating the arbitrator's award." Paragraph 2, argues the Union, protects jobs and Ables merely noted that the protection cannot be thwarted by establishing a business justification for a license that results in layoffs.

■ The Union misreads the district court's opinion. The court does not say that Clinchfield may cause layoffs by licensing out coal operations where the license is economically justified. Rather, it says that Clinchfield may lay off employees for economic reasons, that is, the *cause* of the layoffs may be a decline in demand. If the proximate cause of the layoffs at CBM was the April 1982 demand decline, then ¶ 2 was not violated even though Clinchfield at that

time was licensing out coal lands.[2] Arbitrator Ables should have considered the evidence that CBM was closed because it was an inefficient and expensive mine from which coal no longer could profitably be mined given the depressed prices.

### C.

The district court also found that Arbitrator Ables disregarded the common law of the industry by placing the burden on Clinchfield, instead of the Union, to show that the licensing did not cause the layoffs. The district court, however, does not cite some recent decisions which can be read for the proposition that, unless the employer comes forward with proof to the contrary, if layoffs occur while the company is licensing out coal operations, then the requisite causal link between the licensing and layoffs has been established. *See Big Bear Mining Co. v. District 17, UMWA, Local Union 7692,* 579 F.Supp. 1072 (S.D.W. Va., 1983); *Clinchfield Coal Co. and UMWA Local 1098,* No. 81–28–82–132 (Nicholas, November 22, 1982). In other words, the Union can make out a *prima facie* case merely by showing that layoffs occurred while the employer was licensing out coal mining operations. Then, the burden shifts to the employer to show that the licensing out was not the proximate cause of the layoffs. That seems to be the approach taken by Arbitrator Ables. In any event, the district court's premise— the common law of the industry is settled that the union has the burden of showing the licensing to be a proximate cause of the layoffs—is unsound. Arbitrator Ables simply interpreted the Agreement as he read it and in the absence of a clear body of contrary "common law" interpretations, his interpretation must be deemed to draw its essence from the contract.

### III.

The Union cites several provisions of the Agreement that "provide for the settlement of all such grievance disputes and claims through the machinery in this contract and by collective bargaining without recourse to the courts." The Union argues that the provisions foreclose all judicial review of arbitration, which should be the sole contract grievance settlement mechanism. The argument goes too far. The integrity of the labor agreement and the public interest in having management-labor disputes resolved without unnecessary judicial involvement is fully protected by the limited standard of review handed down in the *Steelworkers Trilogy* cases. The Agreement cannot be read to eliminate that limited review.

### IV.

For the foregoing reasons, the district court's grant of summary judgment in favor of Clinchfield, thereby vacating the arbitrator's award, is affirmed.

AFFIRMED.

SPROUSE, Circuit Judge, concurring:

I concur in the result because I agree that the arbitrator's award should have been set aside as a decision that did not "draw its essence" from the contract. I would affirm the district court's judgment, however, solely because the arbitrator, by refusing to recognize the "cause or result in" qualification of article IA(h)(2) of the collective bargaining agreement, fashioned a brand of industrial justice completely alien to the agreement of the parties.

### I

The collective bargaining agreement in controversy was executed in 1981; it prohibits Clinchfield from "licensing out" coal operations that would "cause or result in

---

**2.** We note that Arbitrator Ables did not find, and the Union did not attempt to show, that the layoffs resulted from a particular licensing out. Nor was there a finding or attempted showing that a license closely preceding the layoffs was "the straw that broke the camel's back." Indeed, our review of the record indicates that the license nearest in time to the May 22, 1982 layoffs was made in December, 1981, well before the layoffs and the April, 1982 decline in demand.

the layoff of employees." Article IA(h)(2), the clause in question, states:

Licensing out of coal mining operations on coal lands owned or held under lease or sublease by any signatory operator hereto shall not be permitted unless the licensing out does not cause or result in the layoff of employees of the Employer.

The union presented no evidence that Clinchfield closed the Camp Branch No. 1 mine and later licensed out coal operations to independent contractors. The evidence was to the contrary. The Camp Branch No. 1 mine closed in 1982, while Clinchfield had not executed any new licenses to independent contractors since 1980. Approximately 50% of Clinchfield's active coal properties are mined by independent contractors. Some of these arrangements were made as long as twenty years before the controversy we review. Not only have Clinchfield and the union executed a number of collective bargaining agreements free of union objections to the independent contractor's operations, but the union has executed collective bargaining agreements with each of the independent contractors. The union conceded during the arbitration hearing that it had never objected to Clinchfield's practice of licensing out these small areas of coal lands for independent coal contractors to mine. It also conceded that it could not point to any individual licensed operation causing or resulting in the layoff of Branch Creek No. 1 miners that created this dispute. The union's claim during arbitration was simple: The cumulative effect of continuing production from all sixty licensed operations lessened the demand for production from Clinchfield-operated mines, permitting Clinchfield to close the less productive Camp Branch No. 1 mine. It reasons that in allowing all of these licensed-out operations to continue producing coal, Clinchfield violated article IA(h)(2). The arbitration award reflects the arbitrator's acceptance of that claim.

The arbitrator interpreted the "cause or result" language to mean that sanctions can be applied now or in the future against Clinchfield for its past actions in executing agreements that were valid when made, and to which the union at least acquiesced. He accomplished this by concluding that general rules of contract law placed upon Clinchfield the burden of proving that licensing out did not cause the layoff of the Branch Creek No. 1 miners. Although the logic of the arbitrator's reasoning in this respect is questionable, I find it unnecessary to determine who has the burden of proving the facts crucial to this decision. Under any view of the arbitration evidence, Clinchfield did not violate article IA(h)(2) of the agreement. By the language of that article, the parties agreed that Clinchfield "*shall*" not license out unless that action "does not cause or result in the layoff of employees of the Employer" (emphasis added). The licensing out arrangements of the heart of this dispute were executed in 1980. Not only does the language of article IA(h)(2) itself contemplate proximate cause and effect, but the agreement, which was executed in 1981, should be applied prospectively only. The meaning of the "cause or result in" language in the context of article IA(h)(2) is plain, unambiguous, and compelling. Moreover, it has been interpreted in numerous arbitration disputes to mean "proximate cause or result"—that is, there must be some evidence that layoffs flowed from or were proximately caused by the licensing agreements. Although the decisions of arbitrators in previous cases are not *stare decisis* in this dispute, both Clinchfield and the union knew of decisions interpreting article IA(h)(2) when they renegotiated their various contracts. The previous interpretations properly can be considered part of the common law of the mining industry, which the parties could have modified or eliminated through negotiation. It is not necessary to refer to the industrial common law to derive the meaning of article IA(h)(2), but that reference validates my position that "cause or result in" can only mean "proximate cause or result."

The arbitrator's obligation in applying article IA(h)(2) was to give effect to the parties' intentions existing when they agreed on that provision. In light of the date of the collectively bargained agreement, the

precise wording of article IA(h)(2), and the past history of the phrase "cause or result in," Clinchfield and the union can only have intended to preclude *future* licensing out operations that *proximately* caused or resulted in layoffs. In ruling that proximate causation was not inherent in article IA(h)(2)'s language, the arbitrator recast the parties' intent. The only proper way to accomplish this is at the bargaining table—an alternative then and still available to the parties. The arbitrator, by usurping the function of the bargaining process, has indeed fashioned an individual brand of industrial justice.

I am cognizant, of course, of the dilemma posed to federal courts by the requirement that we simultaneously must decide whether a particular arbitral decision is drawn from the essence of the collectively bargained agreement yet refrain from reviewing the merits of that decision. I think we need not, however, resort to the semantic shadings so frequently employed in an effort to circumvent that dilemma. Justice Douglas's "essence of the contract" is no less precise a phrase than most of the language that attempts to give content to it. The contract involved in this appeal requires a showing of proximate cause or result. Not only does the arbitrator ignore that plain meaning, but the evidence presented to him fails utterly to establish proximate cause. The arbitrator's decision, then, cannot draw its essence from the agreement.

## II

Were it not for the arbitrator's refusal to honor the meaning of article IA(h)(2), however, his award should have survived appellate review. I do not agree with the district court or the majority that the arbitrator's award should be set aside because he "ignored or overlooked and failed to interpret the words 'coal mining operations'" or because he disregarded improperly Clinchfield's evidence of an economic cause for the layoffs.

The arbitrator reached the wrong result by eviscerating a term of the contract and

his award may be set aside on that basis. In my view, however, the district court's response to the poorly considered arbitration award inappropriately extended into the merits of the arbitrator's decision. The parties to the collective bargaining agreement—not the courts—must shoulder the responsibility for the quality of their arbitrators. The arbitrator of the dispute now before us received evidence from which he could resolve the factual question of whether the transfers involved in the dispute constituted "licensing out of coal mining operations . . . ." It is not relevant to our decision today that the arbitrator reached a different result than we would have reached applying this contract to these facts; our authority extends only to determining whether the arbitrator had the right to decide the issue and whether he decided it within the framework or "essence" of the contract.

There can be no question that Clinchfield exercises extensive control over the "leased" or "licensed" coal operations conducted by independent contractors. It provides both exclusive engineering services that the operator is contractually bound to accept and follow-through implementation of the engineering plan selected by Clinchfield. It controls the operator's production by retaining legal title to all coal mined and maintaining exclusive purchase rights. It often constructs the haulage and access roads, faces up the mine to expose the coal seam for the operator, runs the power lines and supplies power for the operator, and opens up the mine. Clinchfield sets the price to be paid to the operator for delivery of the coal and restricts it from mining and delivering "in excess of such amounts as owner shall indicate to contractor from time to time." Clinchfield reserves the right to audit the operator's books and records and the operator is required to give Clinchfield written notice of any change in ownership within forty-eight hours after it occurs. Clinchfield has exclusive rights to take all depletion allowances for any coal mined by the operator and pays all royalties for that coal to the Health and Retirement

Funds of the United Mine Workers of America. Clinchfield may cancel the operator's right to continue to produce coal at any time by giving fifteen days' written notice. The operator must remove its equipment within that time period or the equipment may become Clinchfield's property.

The evidence of Clinchfield's retained controls, together with the history of the transfers and economic considerations, form a sufficient basis for an arbitrator to conclude that each transfer was the licensing out of a coal mining operation. The facts presented to him influenced his interpretation of the disputed contractual provision, and to set aside the award on any grounds other than those set out in part I of this concurrence is simply to disagree with his view on the dispute's merits. While it is true that the arbitrator failed explicitly to justify critical portions of his award, the Supreme Court has said he may do precisely that. "Arbitrators have no obligation to the court to give their reasons for an award." *Enterprise, supra,* 363 U.S. at 598, 80 S.Ct. at 1361.

The majority opinion questions the "reasonableness" of the arbitrator's legal interpretations and decries his failure to discuss critical terminology, and on page 8 *supra,* the majority states:

> The district court found that Arbitrator Ables neither discussed nor decided the issue of whether "coal mining operations" or "coal lands" were licensed. The district court also reasoned that the terms had special legal meanings to the parties and that "the contracting parties were aware of the literal distinction between naked coal lands and mining operations." The district court further found that Clinchfield had not licensed out any ongoing coal mining operations; rather Clinchfield licensed coal lands that, with one exception, had not been previously mined, to independent contractors who had to initiate their own coal mining operations. Since there was no license of coal mining operations, the district court

concluded that the award did not draw its essence from the Agreement.

I can devise no better language to express my disagreement with this view than that used by Justice Douglas in *Enterprise,* applied at a different time to different facts.

> Respondent's major argument seems to be that by applying correct principles of law to the interpretation of the collective bargaining agreement it can be determined that the agreement did not so provide, and that therefore the arbitrator's decision was not based upon the contract. The acceptance of this view would require courts, even under the standard arbitration clause, to review the merits of every construction of the contract. This plenary review by a court of the merits would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final. This underlines the fundamental error which we have alluded to in *United Steelworkers of America v. American Manufacturing Co.* [363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960)]. As we there emphasized, the question of interpretation of the collective bargaining agreement, is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

*Enterprise, supra,* 363 U.S. at 598–99, 80 S.Ct. at 1361–62. The majority opinion includes a line of reasoning fundamentally at odds with Justice Douglas's caveat, and for this reason I cannot join in that opinion.