**AMERICAN TOTALISATOR COMPANY, INC.**

v.

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 1501.**

Civ. No. Y–85–5058.

United States District Court, D. Maryland.

Sept. 24, 1986.

Jerald J. Oppel, Baltimore, Md., and Thomas P. Humphrey, Washington, D.C., for plaintiff.

Joel A. Smith, Mary Ellen Signorille, Patty L. Parsons, Lutherville, Md., for defendant.

## MEMORANDUM

JOSEPH H. YOUNG, District Judge.

American Totalisator Company, Inc. ("AmTote" or "Company") seeks to vacate an arbitration award entered in favor of the International Brotherhood of Electrical Workers, Local 1501 ("Union" or "Local 1501"), or, in the alternative, AmTote seeks equitable relief to reform the language of their collective bargaining agreement. The action arises under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The Union has filed a motion for summary judgment with respect to both counts, and AmTote responded with a cross-motion for summary judgment with respect to Count I.

## I. FACTUAL BACKGROUND

AmTote is a Delaware corporation with its principal place of business in Sparks, Maryland. It supplies equipment to racetracks in the United States and Canada for the issuance of betting tickets and the computation of parimutuel betting pools. Local 1501 represents the employees who service and maintain AmTote's betting equipment. The Union's headquarters and principal place of business are located in Timonium, Maryland.

The dispute between AmTote and Local 1501 arose over the work schedule and pay rate clauses of their collective bargaining agreement ("Agreement"). The Agreement contains provisions for different work schedules because not all tracks maintain the same racing schedules. Most but not all racetracks operate on Sunday, some operate only three to four days a week including Saturday and Sunday, and some operate six days a week including Saturday and

Sunday. Prior to the instant controversy, Article VI, Section 3 of the Agreement provided that work performed on Sundays would be compensated at double the regular hourly wage, and Article VI, Section 2a established that work performed on Saturdays would be compensated at one and one-half the employee's straight-time rate. Article V, Section 4 of the Agreement specified that at tracks where Saturday and Sunday were part of the regular schedule, the "standard work week" would consist of a standard work day on Saturday, a standard work day on Sunday, and one and one-half standard work days sometime Monday through Friday.

That scheduling was consistent with the premium wages paid for work performed on Saturday and Sunday. Eight hours on Sunday, computed at double-time, equaled sixteen hours of regular-time work. Eight hours on Saturday, compensated at time-and-one-half, translated into twelve hours of straight-time work. Thus an employee needed to work only twelve hours more, or an additional day and one-half, sometime during Monday through Friday in order to work the equivalent of a forty-hour week.

The collective bargaining agreement which embodied these terms was in effect from July 1980 to July 1983. As the time drew near to renegotiate the AGreement, AmTote informed the Union that it intended to reduce the premium wages paid for Sunday employment from double-time to time-and-one-half. The Union refused to accept this decrease in wages, and a two-month strike ensued. Following a series of negotiations, the strike ended when the parties agreed to a decrease in Sunday wages from double-time to one-and-three-fourths times the regular hourly wage during the first year of the Agreement,[1] and a decrease to one-and-one-half times the regular hourly wage during the second and third years of the Agreement.[2] Article VI, Section 3 of the Agreement was changed to

---

**1.** October 15, 1983 through October 14, 1984.

**2.** October 15, 1984 to October 14, 1986.

reflect these new terms.[3] The parties did not renegotiate the definition of "standard work week" found in Article V, Section 4, and it remained unchanged in the new collective bargaining agreement.

On January 9, 1984, Union members who worked at Sunland Park filed a grievance requesting an award of two hours' overtime pay per week. They alleged that their new work schedule, which consisted of six hours Thursday, and eight hours each day Friday through Sunday, did not comply with Article V, Section 4 of the collective bargaining agreement. Article V, Section 4 provides:

> WORK WEEK WHERE SUNDAY AND SATURDAY ARE PART OF REGULAR SCHEDULE
>
> On field installations where Saturday and Sunday are part of the regular schedule, the standard work week will consist of a standard work day on Saturday and Sunday and one and one-half (1½) standard work days Monday through Friday.

The Company replied to this grievance by stating that the change in the work week was consistent with the new Sunday pay rates. Because Sunday hours were compensated at one and three-quarters the straight-time rate, they equaled fourteen hours of regular work, whereas before the new Agreement, they had equaled sixteen hours of straight-time work. Therefore, the standard work week where Saturday and Sunday were part of the regular schedule would include one day and six hours Monday through Friday, not one day and four hours Monday through Friday.

Local 1501 did not accept AmTote's construction of the collective bargaining agreement. It countered with the assertion that Article VI, Section 3, the reduced Sunday pay rates, must apply only where Sunday is *not* part of the regular work schedule,

specifically in Article V, Sections 2 and 6. The Union disputed the Company's claim that the lower Sunday pay rates applied to Article V, Section 4 (Work Week Where Sunday and Saturday are Part of Regular Schedule) because the definition of the standard work week was not changed to correspond with the new rates.[4] The parties could not resolve their dispute, and the matter was submitted to arbitration in a hearing held August 28, 1985.

Both parties submitted briefs and had an opportunity to present evidence, testimony and argument at the arbitration hearing. The question at issue, as framed by the arbitrator, was "Did the Company violate the Agreement when it computed the standard work week in conformity with Article VI Section 3?"[5] The Union argued that the Company initially increased the standard work week from 28 hours to 30 hours, and, as of October 1984, to 32 hours for the same weekly pay. Although the Union recognized that there had been an historical relationship between the premium pay provisions for Sunday work and the work schedule, the Union argued that the arbitrator could not imply such a connection in the new Agreement because the language consistency had been destroyed.

The Company asserted that it was straightforward with the Union during negotiations about lowering its costs in order to remain competitive, and that the parties agreed to a graduated reduction of the premium wage for Sunday work. The arbitrator acknowledged that:

> The increase of straight-time scheduling to one day and six hours for the first year and two days thereafter is a totally consistent mathematical computation when one converts Sunday to 14 hours (i.e., 8 times 1¾ths) and subsequently to 12 hours (8 times 1½). Consistently

---

3. Article VI, Section 3: SUNDAY WORK

    All work performed on Sunday shall be compensated at one and three-quarters (1¾) the employee's straight time rate up to and including October 14, 1984 and at one and one-half (1½) the employee's straight time rate thereafter.

4. *See* Grievance Form and Record of Proceedings.

5. *Decision and Award,* Joseph A. Sickles, Arbitrator, November 14, 1985, at 1.

then, hours are added during the Monday through Friday segment to equal a 40–hours computation based upon the decreased overtime rates.

Arbitrator's *Decision and Award* at 4. The Company argued that if there was an ambiguity in the collective bargaining agreement, the arbitrator must reach the interpretation which affords substantial meaning to all of the terms of the Agreement.

The arbitrator upheld the Union's grievance. Although he admitted that the Company made a very convincing case concerning the consistency of contractual provisions and the contentions of the parties at the last negotiation, the arbitrator felt compelled to choose between the Company's logic and the clear wording of the Agreement:

> I continue to return to Article V Section 4 which states that on field installations where Saturday and Sunday are part of the regular schedule—which is the case here—the standard work week *will* consist of a standard work day on Saturday and Sunday and one and one-half standard work days Monday through Friday. Quite simply, the undersigned does not have the authority to amend the collective bargaining agreement.
>
> In order to reach the conclusions sought by the Company, I would have to, in essence, alter the language of Article V Section 4 and I am neither prepared nor permitted to do that.... [Article V Section 4] states what the standard work days shall be and when the Company increased the [work] week by two, (and then four) hours, it obligated itself to additional compensation.

Arbitrator's *Decision and Award* at 5 (emphasis in original). The arbitrator apparently felt hamstrung by his lack of authority to amend the Agreement's language,[6] because he stated in his opinion that if he were empowered to issue equitable awards,

then certainly the Company's argument of consistency of application would be quite compelling.

AmTote subsequently filed a petition in the Circuit Court for Baltimore County seeking to vacate the arbitration award or, in the alternative, equitable relief to reform the language of the collective bargaining agreement to clarify that Article VI controls the rates of pay which AmTote is obligated to provide to its employees. In conjunction with this motion, the Company filed a request for production of Defendant's documents. Defendant responded by removing the case to federal court and filing a motion for summary judgment. Defendant also filed an answer and counterclaim to AmTote's petition, and objected to the request for production of documents. Plaintiff countered with a cross-motion for summary judgment on Count I of its petition, and both parties subsequently filed reply memoranda.

## II. DISCUSSION

*Count I: Vacating the Arbitrator's Award*

Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, empowers federal courts to review the decisions of labor arbitrators. The Supreme Court articulated the limited scope of that power in *The Steelworkers Trilogy*. "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements." *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). "[S]o far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is

---

**6.** The arbitrator's authority is contractual and springs from the collective bargaining agreement. Article IV, Section 4 states, "The Arbitra-

tor shall have no power to change any of the provisions of this Agreement."

different from his." *Enterprise Wheel, supra,* 363 U.S. at 599, 80 S.Ct. at 1362. However, the arbitrator's award must "draw its essence" from the collective bargaining agreement.

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*Id.* at 597, 80 S.Ct. at 1361.

Courts have struggled to apply the Supreme Court's "essence" standard to the cases before them. The Fourth Circuit recently reaffirmed its adherence to the standard in *Roy Stone Transfer Corp. v. Teamsters, etc., Local Un. 22,* 752 F.2d 949 (4th Cir.1985).[7] The Seventh Circuit, in commenting upon the "essence" test, remarked, "It might in retrospect have been better if the [Supreme] Court had ... made the test simply whether the arbitrator had exceeded the powers delegated to him by the parties. That is the test in the federal arbitration statute, see 9 U.S.C. § 10(d)." *Ethyl Corp. v. United Steelworkers of America, AFL–CIO–CLC, et al.,* 768 F.2d 180, 184, 119 LRRM 3566, 3568 (7th Cir. 1985) (Posner, J.). Judge Posner added:

> Whenever an arbitrator misreads a contract, it is possible to say that his award fails to draw its essence from the contract; that the ground of the award is not the contract but the arbitrator's misreading. But so long as the award is based on the arbitrator's interpretation— unsound though it may be—of the contract, it draws its essence from the contract.

*Id.* 768 F.2d at 184, 119 LRRM at 3568.

The Fourth Circuit, by comparison, has held that where an arbitrator "ignore[s] or overlook[s] and fail[s] to interpret" or "fails to discuss critical contract terminology, which terminology might reasonably require an opposite result, the award cannot be considered to draw its essence from the contract." *Clinchfield Coal Co. v. Dist. 28, United Mine Workers,* 720 F.2d 1365, 1368–69 (1983). A concurring judge, while disagreeing with the majority's analysis in part, also voted to affirm the vacating of an arbitrator's award because, in his view, the arbitrator ignored the plain meaning of a different contract provision. "The arbitrator reached the wrong result by eviscerating a term of the contract and his award may be set aside on that basis." 720 F.2d at 1372 (Sprouse, J., concurring).

Local 1501 argues that the arbitrator's award draws its essence from the collective bargaining agreement because the arbitrator specifically upheld the unequivocal language of Article V, Section 4 of the Agreement regarding the standard work week. AmTote asserts that the arbitrator's award is irrational and does not draw its essence from the contract because, in the Company's opinion, it ignores the negotiations about Sunday pay that led up to the current collective bargaining agreement, and the award eviscerates the clear language of Article VI, Section 3, which states that hours worked on Sunday shall be compensated at $1\frac{3}{4}$ the regular rate in the first year of the Agreement, and at $1\frac{1}{2}$ the regular rate in the second and third years.

There is no genuine issue as to any material fact with respect to the Company's petition to vacate the arbitrator's award. Consequently, the issue is an appropriate one for summary judgment. Fed.R.Civ.P. 56. Both parties admit the following essential facts. Their dispute arose over the Sunday pay provisions and the standard work week clause of the collective bargaining agreement. The Agreement provides that any unresolvable grievance concerning

---

7. The Fourth Circuit affirmed the District Court's upholding an arbitrator's decision, stating "[t]he award in this case did 'draw its essence from the collective bargaining agreement.'" *Roy Stone, supra,* 752 F.2d at 951.

its interpretation or application shall be submitted to an arbitrator. Article IV, Section 1. The arbitrator shall have no power to change any provisions of the collective bargaining agreement. Article IV, Section 4. The parties submitted their dispute to the arbitrator, and each had the opportunity to present briefs, evidence and testimony to bolster their arguments. The controversy before this Court stems from the parties' respective assertions that the arbitrator's award did or did not draw its essence from the contract, and, as a matter of law, the award should or should not be vacated.

This Court holds that the arbitrator did not act outside the scope of his authority as ceded to him by the parties, that the arbitrator's decision "draws its essence" from the collective bargaining agreement, and, therefore, his award must not be vacated. The labor dispute originally arose because the work crew at Sunland Park, whose work schedules encompassed Thursday through Sunday, were assigned to work two hours, and later four hours, more per week than the "standard work week" suggested. The arbitrator, despite his recognition that the Sunday pay premiums and the standard work week were interrelated in past collective bargaining agreements,[8] felt compelled to abide by the clear language of Article V, Section 4 which defined the work week. Because he did not have authority to amend any terms of the Agreement, he could not change the work schedule outlined in Article V, Section 4 to correspond to the pay rates outlined in Article VI, Section 3. Consequently, he ruled "when the Company increased the week by two (and then four) hours, it obligated itself to additional compensation. The Union has limited its request to a straight-time reimbursement and I will sustain the Grievance

in that context." *Decision and Award* at 5.

The arbitrator awarded two (and then four) hours extra pay per week to those workers whose schedules actually had been lengthened under the new collective bargaining agreement. A worker's hourly wage is set at $\frac{1}{40}$th of his or her weekly salary. *See* Article VI, Section 1 and Article VIII of the Agreement. Thus, the arbitrator ruled that AmTote would have to pay the employees whose work schedules were increased, their weekly salary plus two hours of straight time pay in the first year of the Agreement, and four hours in the two succeeding years.

The arbitrator was faced with a dilemma. He recognized that, logically, the standard work week should have been altered under the new bargaining agreement in order to correspond with the changed Sunday pay rates. But he had no authority to change any terms of the contract; he could only interpret and apply it. Thus, faced with the unambiguous language of Article V, Section 4 regarding the standard work week, the arbitrator ruled that those employees who now had to work one day and six hours Monday through Friday, rather than one day and four hours, were owed two hours of additional pay.[9] *Clinchfield Coal Co., supra,* would not require that this award be vacated, because in *Clinchfield* the arbitrator failed to even discuss critical contract terminology which might have required an opposite result in the arbitration. 720 F.2d at 1369. In the instant case, the arbitrator not only discussed the Sunday pay provisions of Article VI, Section 3, he admitted that the Company's arguments with respect to them would have been quite compelling had he possessed the authority to provide equitable relief and amend the Agreement. He reconciled the conflicting contract provisions

---

**8.** At the arbitration hearing, the parties stipulated that from at least 1971 until the advent of the current collective bargaining agreement, the contract's definitions of standard work week were always consistent with the number of hours equated to the premium rates for Saturday and Sunday work.

**9.** In the second and third years of the Agreement, when the Sunday pay premium dropped to 1½ times the regular hourly wage, employees whose schedules were lengthened to two full days sometime Monday through Friday, rather than one day and four hours, would be owed four hours of additional pay.

the best way he could, given his limited authority. His interpretation arose from the unambiguous language of the contract, *United Steelworkers v. Enterprise Wheel & Car Corp., supra,* 363 U.S. at 597, 80 S.Ct. at 1361, and he did not exceed the powers delegated to him by the parties. *Ethyl Corp. v. United Steelworkers of America, supra,* 768 F.2d at 184, 119 LRRM at 3568. Accordingly, this Court will uphold his award.

AmTote urges this Court to believe that the arbitrator's award granted even more compensation to Union members. In the initial grievance proceeding, the Union claimed that the decreases in Sunday pay applied only to those workers whose regular schedules *did not* include Sunday.[10] AmTote characterizes the Union's position at the grievance hearing as a claim that every employee scheduled to work on Saturday and Sunday was entitled to forty hours' pay for the 28 hours stipulated in the standard work week, regardless of the change in the Article VI rate of pay for Sunday work.[11] Thus, according to AmTote, the case involved two, and then four, additional hours of pay per week for *any* employee regularly scheduled to work on Sunday, not just for those employees whose work schedules were actually changed by the new Agreement. The Company argued that such an award, by requiring 40 hours' pay for 28 hours of work, would make Sunday work worth exactly what it was worth under the prior collective bargaining agreement. It would completely eviscerate the unequivocal language of Article VI, Section 3 delineating a decrease in Sunday wages.

This Court does not agree that the arbitrator's ruling awarded that much. In very clear language, the arbitrator stated that the Company obligated itself to additional compensation when it *increased* the work week by two, and then four, hours. Clearly the arbitrator awarded extra pay to those workers whose schedules had actually been lengthened under the new agree-

ment, not to all workers who work on Saturday and Sunday.

For the aforementioned reasons, Local 1501's motion for summary judgment with respect to Count I of AmTote's petition is granted, and AmTote's motion for summary judgment with respect to Count I is denied. This Court will reserve judgment on Local 1501's motion for summary judgment with respect to Count II of the Company's petition.

---

**10.** *See* Grievance Form and Record of Proceedings.

**11.** Plaintiff's Motion for Summary Judgment as to Count I at 9.