46 F.3d 1124
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, Local, Plaintiff-Appellant,
v.
HAMPTON ROADS SHIPPING ASSOCIATION; Sea-Land Service,
Incorporated, Defendants-Appellees.
 No. 94-1838.
 United States Court of Appeals, Fourth Circuit.
 Argued: Nov. 2, 1994.
Decided: Jan. 19, 1995.
 
 ARGUED: Jesse Marden Suit, III, RUTTER & MONTAGNA, Norfolk, VA, for Appellant. Thomas Michael Lucas, VANDEVENTER, BLACK, MEREDITH & MARTIN, Norfolk, VA; Robert J. Attaway, HAIGHT, GARDNER, POOR & HAVENS, New York, New York, for Appellees. ON BRIEF: Thomas F. Hennessy, VANDEVENTER, BLACK, MEREDITH, & MARTIN, Norfolk, VA, for Appellees.
 Before RUSSELL and WIDENER, Circuit Judges, and CHAPMAN, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Plaintiff-Appellant International Longshoremen's Association, Local 1624(ILA), appeals the district court's decision confirming an arbitration decision that Defendants-Appellees Hampton Roads Shipping Association (HRSA) and Sea-Land Service, Inc. (Sea-Land), are not obligated to station a separate, permanent timekeeper at the SeaLand terminal in Portsmouth, Virginia. We affirm.
 
 I.
 
 2
 ILA is a labor organization representing maritime employees at various terminal facilities in the Port of Hampton Roads, Virginia. HRSA is an unincorporated association consisting of employer-members, which is organized under the laws of the Commonwealth of Virginia and has its principal place of business in Norfolk, Virginia. Sea-Land is an employer-member of HRSA.
 
 
 3
 In 1992 a dispute developed among the parties concerning whether the parties' Timekeepers and Interchange Writers' Agreement (Master Agreement) requires Appellees to station a separate, permanent timekeeper at the Sea-Land terminal in Portsmouth, Virginia. The parties selected an arbitrator pursuant to the procedure outlined in Section 18 of the Master Agreement. Section 24(d) of the Clerks', Checkers', and Weighers' Agreement, referred to in Section 18 of the Master Agreement, gives the arbitrator the authority "to hear and settle the dispute," and states that "the decision of the arbitrator shall be final and binding on both parties." Joint Appendix (JA) at 28, 59.
 
 
 4
 The Arbitrator conducted a hearing on April 14, 1993. The Arbitrator summarized the issue as whether HRSA and Sea-Land "are obligated to station a permanent timekeeper at the Sea-Land Terminal in Portsmouth, Virginia." JA at 66. ILA contended that the Sea-Land facility is a separate terminal and that the Master Agreement requires that a separate and additional timekeeper be stationed permanently at the Sea-Land facility. HRSA and Sea-Land relied on the language of the Master Agreement and the custom and practice of the parties in implementing the Agreement to contend that the Agreement does not require that a separate timekeeper be stationed at the Sea-Land facility on a permanent basis.
 
 
 5
 By an Opinion and Award dated September 8, 1993, the Arbitrator held for Appellees. He considered the following relevant contract provisions in arriving at his decision:
 
 
 6
 MEMORANDUM OF AGREEMENT TIMEKEEPERS' AND INTERCHANGE WRITERS' AGREEMENT Effective 12/1/90-9/30/94
 
 PREAMBLE
 
 7
 This agreement, made and entered into by and between the Hampton Roads Shipping Association, as party of the first part, and the International Longshoremen's Association, AFL-CIO and its affiliated Locals No. 862 and 1624 as party of the second part, is meant to cover all work pertaining to the normal duties of timekeeper work for the party of the first part as directed by them in the Port of Hampton Roads.
 
 SECTION 1
 Scope of Work of ILA Timekeepers
 
 8
 The ILA shall have, insofar as it is compatible with the laws of the United States of America and the state of Vir ginia, all work pertaining to the normal duties of timekeeper work as directed by the employers.
 
 
 9
 To the extent legally possible, the employer members of the Association agree they will not directly perform work or contract out work which traditionally and regularly has been and currently is performed by employees covered by this agreement or employees covered by ILA craft agreements unless such work is performed by employees covered by ILA agreements.
 
 SECTION 3
 Duties of Timekeepers
 
 10
 The duties of the timekeepers shall be normal timekeeper duties as directed by the employer.
 
 SECTION 23
 Number of Timekeepers Required
 
 11
 A timekeeper will not work more than eight (8) general cargo gangs. Said eight (8) gangs shall not be limited to one ship, but shall be limited to one terminal. It is understood timekeepers will continue to work additional gangs of lesser size as in the past. A timekeeper shall be employed per vessel until all timekeepers are utilized. However, a timekeeper will work all gangs on any one ship.
 
 
 12
 JA at 66-67 (emphasis added).
 
 
 13
 The evidence submitted at the hearing and considered by the Arbitrator included the following. In 1972 and 1973, Sea-Land, a major American flagged steamship line, leased portions of the Portsmouth Marine Terminal (PMT) and established its own facility. Sea-Land began operations on the site in 1975. Although Sea-Land and PMT share certain berth, crane, space, and security arrangements, ILA International Vice President Edward Brown testified that Sea-Land has experienced considerable growth since 1991 in the volume of work at its facility. ILA witnesses also testified that Sea-Land has constructed a concrete barrier between the two facilities for traffic control and that Sea-Land has separate management, storage sheds, cranes, and a separate labor employer and gate facility.
 
 
 14
 Sea-Land subscribes to the current Master Agreement between ILA and HRSA, but it does not directly employ any permanent ILA labor. Following ILA's objection to Sea-Land's initial attempt to utilize PMT labor to service its vessels, Ceres Marine Terminals (Ceres) has provided ILA terminal labor and supervision for Sea-Land. Ceres provides ILA timekeepers who check in all general cargo and container cargo gangs, and these timekeepers are referred by ILA to PMT and Sea-Land.
 
 
 15
 Ceres employs two full-time ILA timekeepers and other additional part-time ILA timekeepers in order to meet its contractual commitments to check in ILA labor at various terminal facilities in Hampton Roads. The ILA timekeepers who check in labor for Ceres at PMT and Sea-Land are stationed at a Ceres trailer at the entrance of the PMT facility, where they check in all ILA labor entering both PMT and Sea-Land. Ceres Manager Dennis Weaver testified that this practice has been in place since 1975 or 1976. ILA labor orders are referred through ILA to Ceres, and these referred laborers are checked-in by ILA timekeepers employed by Ceres.
 
 
 16
 Testimony from both parties' witnesses revealed that since 1975 no ILA timekeeper has been assigned under the parties' agreements exclusively to check in ILA labor working at Sea-Land. In fact, Brown and HRSA Chief Negotiator Johnnie Johnson both stated that the custom and practice in the Port of Hampton Roads is to have an ILA timekeeper check in labor at both PMT and Sea-Land, and not to have a dedicated timekeeper stationed solely at Sea-Land. Testimony from Johnson and former HRSA President Jack W. Mace further revealed that in formal negotiations since 1960, ILA has never proposed or secured an agreement for a dedicated timekeeper at the Sea-Land facility. ILA Local 1624 President Charles Capps, however, testified that ILA attempted in 1989 to secure an agreement with SeaLand for a timekeeper to be stationed permanently at the Sea-Land facility but that Sea-Land did not agree to the proposal. Capps, who had participated in the 1977 contract negotiations between ILA and HRSA, also testified that the parties added the phrase "at one terminal" in 1977 to Section 23 of the Master Agreement in order to keep timekeepers from having to travel long distances from one facility to another to check in ILA labor.
 
 
 17
 In his Opinion and Award for Appellees, the Arbitrator first found that Sea-Land was a separate terminal that was bound to the Master Agreement as a signatory to that agreement. The Arbitrator then reasoned:
 
 
 18
 [R]esolution of this dispute turns on an interpretation of Section 23 of the agreement, the provision relied upon by the Union in support of its position. After the following analysis of the language of that section, along with the factual circumstances of past practice and bargaining history, it becomes clear that the Company [HRSA] is not contractually obligated to station a permanent timekeeper at the SeaLand terminal.
 
 
 19
 JA at 73. The Arbitrator ruled that Section 23 does no more than limit to eight the number of general cargo gangs that each timekeeper is allowed to work. Relying on Capps' testimony, the Arbitrator concluded that the parties inserted the phrase "limited to one terminal" into the Master Agreement in order to relieve the timekeeper of the burden of traveling from one terminal to another to check in ILA labor. The Arbitrator also evaluated the custom and practice of the parties concerning the stationing of a permanent timekeeper at the Sea-Land facility, noting that "the unequivocal, consistent practice, repeated over some 25 years of not stationing a timekeeper at the SeaLand Terminal creates a logical assumption that the parties intended to retain this status quo as they negotiated successive agreements without any reference to the practice." JA at 74.
 
 
 20
 On November 23, 1993, ILA filed suit in the United States District Court for the Eastern District of Virginia to vacate the Arbitrator's award. The parties filed cross motions for summary judgment, and the district court heard oral argument on the cross motions on June 10, 1994. On June 15, 1994, the district court issued an order granting Appellees' summary judgment motion, in effect confirming the Arbitrator's award.
 
 II.
 
 21
 ILA contends that the district court erred in upholding the Arbitrator's award because the award was unlawful under the Labor Management Relations Act (LMRA), 29 U.S.C. Sec. 185, et seq., and the Federal Arbitration Act (FAA), 9 U.S.C. Sec. 1, et seq. We review de novo a district court's decision confirming an arbitration award. See Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co., 991 F.2d 141, 145 (4th Cir.1993). From this standard of review, we find that ILA's arguments under both statutes lack merit.
 
 A.
 
 22
 Section 301 of the LMRA, 29 U.S.C. Sec. 185, grants federal courts the authority to review decisions of labor arbitrators; but courts have consistently held that judicial review of arbitration awards is very narrow under the LMRA. In 1960, the Supreme Court established the well settled standard that a reviewing court should not overturn an arbitration decision as long as the decision "draws its essence from the collective bargaining agreement." United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597 (1960); see also Sheet Metal Workers Int'l Ass'n, Local Union No. 33 of Northern Ohio No. 70 v. Power City Plumbing & Heating, Inc., 934 F.2d 557, 561 (4th Cir.1991). The Court added that when the parties have bargained for an arbitrator's interpretation of their labor agreement, as in this case, "the courts have no business overruling [the arbitrator] because their interpretation of the contract is different than his." Enterprise Wheel, 363 U.S. at 599, quoted in Clinchfield Coal Co. v. District 28, UMWA & Local Union No. 1452, 720 F.2d 1365, 1368 (4th Cir.1983). In 1987 the Court reaffirmed this deferential standard of review and held that "courts are not authorized to reconsider the merits of an [arbitrator's] award even though the parties may allege that the award rests on errors of fact or misinterpretation of the contract." United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 36 (1987). The Court further reasoned that an arbitrator's award draws its essence from the contract and does not reflect the arbitrator's own brand of industrial justice as long as the arbitrator was "even arguably construing or applying the contract and acting within the scope of his authority." Id. at 38 (emphasis added); accord Upshur Coals Corp. v. UMW, Dist. 31, 933 F.2d 225, 229 (4th Cir.1991).
 
 
 23
 The parties do not dispute that the Arbitrator in this case was properly selected pursuant to the Master Agreement and that they had a full and fair hearing on the merits. Furthermore, because this Court is not authorized to review the merits of the Arbitrator's factual findings, see Misco, 484 U.S. at 36, we accept the Arbitrator's conclusion that Sea-Land is a separate terminal bound as a signatory to the Master Agreement. Thus, the central issue for this Court is the enforceability of the Arbitrator's decision that the Master Agreement does not obligate HRSA and Sea-Land to employ a separate timekeeper solely for the Sea-Land terminal.
 
 
 24
 As the judicial standards establish, this Court should affirm the Arbitrator's conclusion if it draws its essence from the Master Agreement.[1] In reaching his decision, the Arbitrator specifically reasoned that his analysis "turned on an interpretation of Section 23 of the Master Agreement, the provision relied upon by ILA in support of its position." JA at 73. The Arbitrator then analyzed the language of the section and the parties' bargaining history and past practice in reaching his conclusion.
 
 
 25
 The Arbitrator first considered the language of Sec. 23 itself and reasoned that the purpose of the section, as evidenced by the section heading, was to establish the "number of timekeepers required" and that the first sentence addressed the issue by limiting to eight the number of general cargo gangs that each timekeeper is allowed to work. The Arbitrator also considered the critical language in Sec. 23 that, "[s]aid eight (8) gangs shall not be limited to one ship, but shall be limited to one terminal." In determining the intent of this language, the Arbitrator relied upon the testimony of ILA's own witness, ILA President Capps, who stated that the language was added to Sec. 23 to relieve the timekeeper of the burden of traveling between terminals to check in ILA labor. As further support for his interpretation of Sec. 23, the Arbitrator noted the fact that Sea-Land had rejected ILA's 1989 attempt to secure an agreement to have a timekeeper permanently stationed at the Sea-Land facility.
 
 
 26
 The Arbitrator also considered the February 24, 1981, ruling of the Contract Board Grievance Committee, which specified when a timekeeper shall be employed to check in portainer operators. The ruling included the following relevant statement: "If there is other deep sea work being performed by the terminal operator at any time, the timekeepers will be used for the duration for such other operations." JA at 70. The Arbitrator accepted ILA's contentions that such rulings are incorporated into and form part of the Master Agreement, but he rejected ILA's argument that the ruling supported the claim that each terminal facility is required to maintain a separate timekeeper. Instead, the Arbitrator concluded that the ruling only provided that a timekeeper is required when labor is checked in at the terminal. Based on Brown's testimony that Ceres employs timekeepers who check in laborers at both the PMT and Sea-Land terminals, the Arbitrator reasoned that, "[t]he obligation expressed in this Board ruling is satisfied by the undisputed practice of using Ceres timekeepers at the Sea-Land terminal to check in gangs." JA at 74.
 
 
 27
 Finally, the Arbitrator concluded that the parties' past practice supported his holding "even if there is some ambiguity in the contract language regarding this matter." Id. The Arbitrator highlighted that the parties' consistent practice for over 25 years has been not to station a timekeeper at the Sea-Land terminal, and he inferred that the parties must have intended to maintain the practice because they made no reference to changing the status quo in their successive agreements.
 
 
 28
 This detailed recount of the Arbitrator's reasoning is important because it conclusively demonstrates that the Arbitrator drew his decision from a detailed analysis of the Master Agreement and the relevant past practice of the parties. As the district court emphasized in granting Appellees summary judgment in this case:
 
 
 29
 The arbitrator's opinion, whether I agree with it or not, is not important, but his decision states the issues, states the reason for his interpretation, and [sic] based upon what appears to be appropriate considerations and is an interpretation of the contractual provisions.
 
 
 30
 Therefore, I believe that under the established law there is nothing that a court can do to substitute its judgment of the facts and to second guess the arbitrator and to substitute its judgment for that of the arbitrator. I believe, in essence, that is what the union is asking in this case.
 
 
 31
 JA at 407-08.
 
 
 32
 We agree with the district court and hold that the Arbitrator's award clearly "drew its essence" from the parties' Master Agreement and that he was certainly, at a minimum, "arguably construing or applying the contract and acting within the scope of his authority" in finding that the Master Agreement did not obligate HRSA or SeaLand to station a separate timekeeper at the Sea-Land terminal. See Misco, 484 U.S. at 38.[2] In contrast to cases cited by ILA, the Arbitrator in this case did not impose a remedy that directly contradicts the express language of the parties' collective bargaining agreement.[3] Instead, the Arbitrator conducted a valid inquiry into the ambiguous language of Sec. 23 of the Master Agreement and concluded that HRSA and Sea-Land were not obligated to maintain a separate, permanent timekeeper at the Sea-Land terminal. See Monongahela Power Co. v. Local No. 2332, Int'l Brotherhood of Electrical Workers, 566 F.2d 1196, 1199 (4th Cir.1976) (reasoning that arbitrator may construe ambiguous contractual language).
 
 B.
 
 33
 As with review of arbitration awards under the LMRA, judicial review of such awards is very narrow under the FAA. The Supreme Court has stated that the power to vacate an award under the FAA is limited to the grounds provided in Sec. 10 of the FAA. Wilko v. Swan, 346 U.S. 427, 436 (1953); see also Remmey v. PaineWebber, Inc., 32 F.3d 143, 146 (4th Cir.1994), petition for cert. filed, 63 U.S.L.W. 3439 (U.S. Nov. 21, 1994) (No. 94-916). In order to hold the Arbitrator's award unenforceable, ILA seeks to invoke Sec. 10(a)(4), which provides that a court may vacate an arbitrator's award when the arbitrator "exceeded [his] powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. Sec. 10(a)(4).
 
 
 34
 The Supreme Court has held that a contention that "the arbitrators misconstrued a contract is not open to judicial review" under Sec. 10(a)(4) of the FAA. Bernhardt v. Polygraphic Co. of America, Inc., 350 U.S. 198, 203 n. 4 (1956), quoted in Miller v. Prudential Bache Securities, Inc., 884 F.2d 128, 130 (4th Cir.1989), cert. denied, 497 U.S. 1004 (1990). This Court has added that a party may not use Sec. 10(a)(4) merely as a second attempt to obtain review on the merits. Remmey, 32 F.3d at 146, 150-51; see also Randall v. Lodge No. 1076, 648 F.2d 462, 467 (7th Cir.1981) (party may not use issue of arbitrator's authority as a "ruse" to obtain review of merits). As
 
 
 35
 Appellees note, ILA's argument that the Arbitrator exceeded his authority is essentially a disagreement with the Arbitrator's construction of the Master Agreement. ILA presents no facts to support its allegation that the Arbitrator exceeded his authority, and the evidence reveals that ILA's grievance was referred to the Arbitrator pursuant to the parties' valid collective bargaining agreement, which authorized him "to hear and settle the dispute" and to issue a decision which is "final and binding on both parties." JA at 28. ILA also does not present sufficient evidence either that the Arbitrator decided an issue that the parties had not submitted to him or that the Arbitrator considered impermissible factors in arriving at his decision.
 
 
 36
 Furthermore, no evidence in the record demonstrates that this Court should vacate the Arbitrator's award because he "so imperfectly executed [his powers] that a mutual, final, and definite award upon the subject matter submitted was not made." Prior cases addressing this provision have vacated arbitration awards on this ground only when the arbitrator either failed to resolve an issue presented to him or issued an award that was so unclear and ambiguous that the reviewing court could not engage in meaningful review. See, e.g., Bell Aerospace Co. Division of Textron v. Local 516, 500 F.2d 921, 923 (2d Cir.1974) (ambiguous award); Galt v. Libbey-Owens-Ford Glass Co., 397 F.2d 439, 442 (7th Cir.) (arbitrators failed to mention a defense presented to them), cert. denied, 393 U.S. 925 (1968). In this case, the Arbitrator explicitly concluded that "the Company[HRSA] is not obligated to station a permanent timekeeper at the Sea-Land terminal in Portsmouth, Virginia." JA at 75. We therefore conclude that the Arbitrator thus resolved the issue presented to him for decision, and his award clearly informed the parties of the conduct required of them. See Remmey, 32 F.2d at 150 (holding award to be "mutual, finite, and definite").
 
 III.
 
 37
 For the foregoing reasons, we affirm the decision of the district court granting of summary judgment to Appellees and confirming the Arbitrator's award.
 
 
 38
 AFFIRMED.
 
 
 
 [1]
 In order to be legitimate, an arbitration award also must neither be procured by fraud nor be against public policy. Power City Plumbing, 934 F.2d at 561 (citing Misco, 484 U.S. at 42-43). We need not address these requirements because ILA did not raise these concerns on appeal
 
 
 [2]
 In so holding, we reject ILA's argument that the Arbitrator exceeded his authority under the LMRA because he considered the parties' custom and practice prior to 1990, the year Sea-Land became a signatory to the Master Agreement. This argument overlooks the fact that an arbitrator does not exceed his authority in considering sources other than the language of the collective bargaining agreement, such as the parties' past practice and the history of the agreement, as long as the award is ultimately based on the agreement itself. See United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581-82 (1960); Norfolk Shipbuilding & Drydock Corp. v. Local No. 684, 671 F.2d 797, 799-800 (4th Cir.1982) (reasoning that arbitrator must consider existing law of particular plant or industry as integral part of collective bargaining agreement)
 
 
 [3]
 We note that this case is distinguishable from the cases ILA cites in which this Court, as well as other courts, reversed a lower court's enforcement of an arbitrator's award. The cases are distinguishable because they involved situations in which the arbitrator had issued an award in violation of the plain meaning of unambiguous language in the parties' collective bargaining agreement. See, e.g., Monongahela Power Co. v. Local No. 2332, Int'l Brotherhood of Electrical Workers, 566 F.2d 1196, 1200-01 (4th Cir.1976) (holding that arbitrator had no authority to change penalties company imposed when agreement expressly stated that the company's right was "unqualified")