813 F.2d 1227
 108 Lab.Cas. P 10,261
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
BALTIMORE AND OHIO RAILROAD COMPANY, Plaintiff-Appellee,
v.
BROTHERHOOD OF RAILWAY, AIRLINE AND STEAMSHIP CLERKS,
FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYERS: B.M.
Hill; S.J. Swisher; R.L. Shepherd; J.M. Emerick; K.G.
Rotruck; C.S. Van Meter; D.W. Hanekamp; T.L.
Householder; R.A. Shrout; J.K. Hunt; G.H. Mechem; R.R.
Wagner; M.E. Roberts; G.C. Fisher; P.G. Liller; E.E.
Gaus; J.W. Hemmis; C.M. Bechman; R.D. Fogle; V.N.
Teagarden; D.W. Laughlin; T.D. Riley; N.R. Chester;
E.J. Staley; W. Dorsey; G. Henry; M.H. Redman; H.
Fry; D. Hendershot; D.C. Wentz; L.C. Brannon, Jr.;
A.G. Bruchsch; C.W. Barr; C.E. Sturdivant; R.C. Conrad;
R.H. Lee; A.A. Womack; R.T. Carletti; J.L. Darden;
W.E. Tabeling; P.E. Wright; H.W. Harvey; C.J.
Heffley; C.I. Runion; R.E. Neidermeier; H.L. Haupricht;
R.L. Hastings; Helen Rinker; J.M. Underwood; J. Rusynyk;
G.H. Hiltburner; G.H. Bursiel; M.A. King; A.E.
Runion, Jr.; L.D. Dawson; L.J. Oney; R.J. Neidermeier;
F.N. McQuown; P.E. Clemons; J.C. Beekman, Defendants-Appellants,
Railroad Yardmasters of America, Defendant.
 No. 86-2547.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 9, 1986.
Decided March 9, 1987.
 
 Before ERVIN, CHAPMAN and WILKINSON, Circuit Judges.
 Edgar N. James (Joseph Guerrieri, Jr.; Guerrieri & Sweeney, on brief), for appellants.
 Daniel Christopher Ohly (H. Russell Smouse; Melnicove, Kaufman, Weiner, Smouse & Garbis, P.A.; Thomas L. Samuel; Nicholas S. Yovanovic, Seaboard System Railroad, on brief), for appellees.
 CHAPMAN, Circuit Judge:
 
 
 1
 This case grows out of a dispute between the B & O Railroad and the Brotherhood of Railway, Airline, and steamship Clerks. (BRAC) At issue is whether B & O has violated the collective bargaining agreement by permitting yardmasters to tear off messages printed by teletype. The National Railroad Adjustment Board (NRAB) panel which heard this matter determined that this practice was contrary to the collective bargaining agreement and fined B & O $3,000,000 for past violations. B & O sought review of this decision in the district court, which vacated the panel's decision on the grounds that the NRAB panel had exceeded its jurisdiction by ignoring critical language in the collective bargaining agreement. BRAC has appealed, but finding no error, we affirm.
 
 I.
 
 2
 For some fifty years B & O has used teletype machines at various locations within its system. These machines have been operated by members of the Telegraphers Union (Telegraphers) since 1945, when the Telegraphers and B & O entered into a Memorandum of Understanding which brought the operation of teletype machines within the scope of the Telegraphers collective bargaining agreement.
 
 
 3
 Contemporaneously, B & O began installing these teletype machines in some sales offices and yard offices, where they were used by employees who were not union members to transmit messages to relay offices within the same terminal and city. Union members in the relay offices would then retransmit these messages to other terminals in other cities. A dispute about this practice arose, and in 1947 an Interpretation of the 1945 memorandum of Understanding was executed by B& O and the Telegraphers. The interpretation provided that the Memorandum did not extend to intra-city communications by teletype machines at those locations where communications had previously been conducted by telephone or messenger. The Memorandum and Interpretation were included in Article 31 of the collective bargaining agreement executed between B & O and the union in 1948.
 
 
 4
 Since 1948, it has been the practice of B & O to allow employees who are not union members to operate teletype machines in accordance with the Interpretation. Also, in 1948, B & O began using teletype machines to transmit switch list from the yard office to yardmasters at each end of the yard. The yardmasters had to tear the list off the teletype machines in order to use them. Until the instant action, this practice has never been challenged. In 1955, Article 31 was revised and reappeared as Article 36. Though Article 36 did not mention the 1947 Interpretation, both B & O and the union continued to abide by the terms of the Interpretation.
 
 
 5
 In 1971, B & O began replacing the older teletype machines with newer models that used multi-part paper. This required that the yardmaster separate the various copies after tearing the switch list from the machine. The entire procedure consumed but a few seconds, totaling less than five minutes per day. Additionally, in 1971, the Telegraphers Union merged into BRAC. As a result of this merger, the railroad industry entered into a National Mediation Agreement. The Agreement allowed the new union to make work assignments interchangeable between Clerks and Telegraphers. It also permitted BRAC, the surviving union, to select the provisions it preferred from the merged unions' collective bargaining agreements, so long as no change was made in the substance of the provisions selected. BRAC had complete control over which provisions it kept and which it rejected.
 
 
 6
 in fashioning its new collective bargaining agreement, BRAC retained Article 36 of the Telegraphers' collective bargaining agreement, though not in its entirety. Those paragraphs related to the obsolete Morse telegraphy equipment were abandoned as were paragraphs which placed restrictions on BRAC members, and the "de minimis" provisions of Article 36. The de minimis provisions were rendered unnecessary because BRAC adopted the Scope Rule from the old BRAC collective bargaining agreement which contained general de minimis provisions.
 
 
 7
 In 1974, B & O opened Terminal Service Centers at various locations within its system. As a result, a substantial number of employees, including clerical personnel, were moved from yards into centralized data process offices. Although the centralization created many new clerical positions at these Centers, it left the yardmasters alone in their offices. Printers were placed in more yardmasters' offices to permit them to receive switch list transmitted by clerical employees at the Centers. These transmissions lie at the heart of this litigation. In every alleged violation at issue here, the clerical positions in the yardmasters' offices had been abolished and those clerical employees were transferred to the Terminal Service Centers. The transmissions complained of were all intracity communications.
 
 
 8
 In 1975, BRAC began complaining that B & O was violating Rules 1 and 67 of the collective bargaining agreement by permitting yardmasters to tear switch lists off the printers and separate the copies. When the parties were unable to resolve this dispute, BRAC petitioned the NRAB for review. Before the panel, B & O sought to justify the challenged practice on the basis of Rule 1, the Scope Rule, and Rule 67, the modern progeny of the 1945 Memorandum of Understanding. Rule 1 reads, in pertinent part:
 
 
 9
 (b) When the assignment of clerical work in an office, station, warehouse, freight house, storehouse, or yard, occurring within a spread of ten (10) hours from the time such clerical work begins, is made to more than one (1) employee not classified as a clerk, the total time devoted to such work by all such employees at a facility specified herein shall not exceed four (4) hours per day.
 
 
 10
 * * * * *
 
 
 11
 (c) when a position covered by this Agreement is abolished, the work assigned to the same which remains to be performed will be reassigned in accordance with the following: * * * * *
 
 
 12
 (c)(2) In the event no position under this Agreement exists at the location where the work of the abolished position or positions is to be performed, then it may be performed by a Yardmaster, Foreman or other supervisory employee, provided that less than four (4) hours work per day of the abolished position or positions remains to be performed; and further provided that such work is incident to the duties of a Yardmaster, Foreman or other supervisory employee.
 
 
 13
 B & O argues that Rule 1(b) permits its yardmasters to perform clerical work at the yard if the work occupies fewer than four hours of a ten hour time period. B & O asserts that Rule 1(c)(2) permits a yardmaster to spend up to four hours per day on clerical work if the clerical positions at the yard have been abolished. B & O also argues that its practice was permissable under Rule 67, which reads in pertinent part:
 
 
 14
 Work in connection with the operation of transmitting, reperforating and receiving units, including tearing off and separating messages and reports, checking and correction of errors, shall be performed by the employees covered by this Agreement.
 
 
 15
 Though this section of Rule 67 clearly includes the work performed within the scope of the collective bargaining agreement, B & O argued that its practice was permissible under the 1947 Interpretation, because the Interpretation governs Rule 67.
 
 
 16
 The NRAB panel disagreed and decided that because Rule 67 had not been adopted unchanged, the past interpretations of the Rule, including the 1947 Interpretation, were no longer binding. Although the panel decision acknowledges that B& O had relied upon the Scope Rule to justify its practices, the panel failed to discuss the provisions of the Scope Rule or its applicability to the instant dispute. The panel relied upon the "Call Rule", Rule 8, and awarded three hours of pay for every day that the yardmasters tore a switch list off teletypes. The sum awarded for past violations totaled $3,000,000. At the same time, another NRAB panel heard identical claims brought against B & O by its clerical employees at the Chicago Terminal. This second panel, presided over by Referee Silagi, found that the challenged practices were permissible because they were within the exceptions contained in the Scope Rule, and because they were in accord with the parties dealings for twenty-five years.
 
 
 17
 Dissatisfied with the panel decision in the instant case, B & O sought review in the United States District Court for the District of Maryland. The district court relied upon the decision of this court in Clinchfield Coal Co. v. District 28 UNW, 720 F.2d 1368 (4th Cir. 1983), in holding that the NRAB panel had exceeded its jurisdiction by ignoring the provisions of the Scope Rule and, thereby, effectively rewritten the collective bargaining agreement. The district court also held that the panel had exceed its jurisdiction by awarding "penalty pay" in the absence of either wilful or wanton misconduct, or a provision for penalty pay in the collective bargaining agreement. This appeal followed.
 
 II.
 
 18
 The Supreme Court has stated that the scope of review of an NRAB decision is among the narrowest known to law. union Pacific Railway Co. v. Sheehan, 439 U.S. 89 (1978). indeed, 45 U.S.C. Sec. 151 prohibits a court from setting aside an NRAB award unless the NRAB has failed to comply with the requirements of the Railway Labor Act, the NRAB has failed to confine itself to the scope of its jurisdiction in interpreting the provisions of the collective bargaining agreement, or a member of the NRAB panel making the award is guilty of fraud or corruption. As this court has held, the parties may not relitigate, issues which have already been decided by the NRAB. Radin v. U.S., 699 F.2d 681 (4th Cir. 1983).
 
 
 19
 That the scope of review is highly restricted, however, does not mean that courts may never set aside an NRAB award. Awards may be set aside if they are wholly baseless and completely without reason, Gunther v. San Diego and Arizona Railway Co., 383 U.S. 257 (1965); if they are actually and undisputedly without foundation and reason or fact, Brotherhood of Railroad Trainmen v. Central Georgia Railway Co., 415 F.2d 403 (5th Cir. 1969); or if the NRAB decision fails to draw its essence from the collective bargaining agreement, international Association of MACH v. So. Pac. Transp,, 626 F.2d 715 (9th Cir. 1980); BRAC v. Kansas City Terminal Railway Co., 587 F.2d 903 (8th Cir. 1978); Diamond v. Terminal Ry. Alabama State Docks, 421 F.2d 228 (5th Cir. 1970).
 
 
 20
 The NRAB exceeds its jurisdiction when there is manifest disregard of the collective bargaining agreement, Ludwig Honold Manufacturing Co. v. Fletcher, 405 F.2d 1123 (3rd Cir. 1969), or when an award fails to take into account any existing common law of the particular plant or industry, Norfolk Shipping & Dry Dock v. Local No. 684, 671 F.2d 797 (4th Cir. 1982). A collective bargaining agreement is more than a contract, it is a generalized code to govern the myriad cases which the draftsman cannot anticipate. United Steel Workers of America v. Warrier and Gulf N. Co., 363 U.S. 574 (1960). This generalized focus does not, however, permit an arbitrator to rewrite the provisions of the collective bargaining agreement. See, e.g., Mistletoe Express Service v. Motor Expressmens Union, 566 F.2d 692 (10th Cir. 1977); W.R. Grace and Co. v. Local Union 759, 652 F.2d 1248 (5th Cir. 1981). Thus, this court has held that where an arbitrator fails to discuss, in his decision, critical contract terminology, which might reasonably require the opposite result, the award cannot be considered to draw its essence from the contract. Clinchfield Coal v. District 28, UMW, 720 F.2d 1365 (4th Cir. 1983).
 
 
 21
 In the instant case, the NRAB panel noted that B & O had raised the Scope Rule issue but then the panel failed to provide any discussion or analysis of that issue. Even a cursory reading of the relevant sections of the Scope Rule would lead the reader to believe that those practices which BRAC now challenges are completely proper under the collective bargaining agreement. Because the NRAB panel has provided no explanation of either the Scope Rule provisions at issue here, or their applicability to the instant case, Clinchfield Coal., Supra, requires that the panel's decision be vacated.
 
 
 22
 The district court also vacated the monetary award on separate grounds, holding that it was penalty pay because the sum awarded was so excessive in relation to the work performed that it could not be characterized as compensatory, and that under Norfolk and Western Railway Co. v. BRAC, 657 F.2d 596 (4th Cir. 1981), penalty pay is proper only if the employer has been guilty of wilful or wanton misconduct or if the collective bargaining agreement provides for penalty pay. Because Clinchfield Coal requires that the NRAB panel's decision in the instant case be vacated, we need not reach, and therefore, do not decide the issue of penalty pay. For the reasons foregoing, the decision of the district court is
 
 
 23
 AFFIRMED.
 
 ERVIN, Circuit Judge, dissenting:
 
 24
 The district court judge and the majority correctly state the standard of review that is to guide us in cases such as this: it is "among the narrowest known to the law." E.g., Norfolk & Western Railway Co. v. Brotherhood of Railway, Airline & Steamship Clerks, Freight Handlers, Express and Station Employees, 657 F.2d 596, 599 (1981). This is hardly a contestable issue since the Supreme Court has stated that the Railway Labor Act "means what it says" when it provides that a final order of NRAB is conclusive on the parties and can be set aside only for one of the three reasons provided in the statute: (1) failure of NRAB to comply with the Act itself; ( 2 ) "failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction"; or (3) fraud or corruption. 45 U.S.C. Sec. 153 First (q) (1982). See Union Pacific Railroad Co. v. Sheehan, 439 U.S. 89, 93 (1978) (per curiam) ("Only upon one or more of these bases may a court set aside an order of the Adjustment Board.... the Adjustment Board certainly was acting within its jurisdiction and in conformity with the ... Act.... We have time and again emphasized that this statutory language means just what it says."); Andrews v. Louisville & Nashville Railroad Co., 406 U. S. 320, 325 (1972) ("A party who has litigated an issue before the Adjustment Board on the merits may not relitigate that issue in an independent judicial proceeding ... He is limited to the judicial review ... that the Act itself provides."); Gunther v. San Diego & Arizona Eastern Railway Co., 382 U.S. 257 (1965).
 
 
 25
 The authority for the proposition that courts may nevertheless set aside an NRAB award is more apocryphal than the majority indicates. For example, in Gunther, cited by the majority, the plaintiff employee was removed from his job as a railroad fireman due to reports from the railroad's physicians that he was not physically qualified to continue to work. The Adjustment Board granted the plaintiff's claim for reinstatement and back pay after the Board appointed a panel of doctors who found the plaintiff physically qualified. The Board construed the plaintiff's contract to require his continued employment priority as a senior employee while physically fit. The railroad refused to comply and the plaintiff sued in the United States District Court for the Southern District of California. That district court refused to grant relief, holding the award erroneous. The Ninth Circuit affirmed. See F. J. Gunther v. San Diego & Arizona Eastern Railway Co., 336 F.2d 543 (9th Cir. 1964).
 
 
 26
 The Supreme Court reversed in no uncertain terms. Justice Black wrote:
 
 
 27
 The District Court found nothing in the agreements restricting the railroad's right to remove its employees for physical disability upon the good-faith findings of disability by its own physicians. Certainly it cannot be said that the Board interpretation was wholly baseless and completely without reason. We hold that the District Court and the Court of Appeals as well went well beyond their province in rejecting the Adjustment Board's interpretation of this railroad collective bargaining agreement. As hereafter pointed out, Congress, in the Railway Labor Act, invested the Adjustment Board with the broad power to arbitrate grievances and plainly intended that interpretation of these controversial provisions should be submitted for the decision of railroad men, both workers and management, serving on the Adjustment Board with their long experience and accepted expertise in this field.... This Court time and again has emphasized and re-emphasized that Congress intended minor grievances of railroad workers to be decided finally by the Railroad Adjustment Board.
 
 
 28
 382 U.S. at 261-63 (emphasis added).
 
 
 29
 Of the four Railway Labor Act cases cited by the majority and relied on by the district court judge, three absolutely refused to tamper with an arbitration board's finding under the review provisions noted above; their language concerning an NRAB decision's failure to "draw its essence from the collective bargaining agreement" was purely dicta. The dictum in each case seems to have had its source in the fourth of the four cases, Brotherhood of Railway Trainmen v. Central of Georgia Railway Co., 415 F.2d 403 (5th Cir.), cert. denied, 396 U.S. 1008 (1969). There, also, the court of appeals reversed a district court's holding that ran contrary to a Board award. The opinion, by Judge Wisdom, carefully parses the legislative history of the appeals provision for Board awards. The court said:
 
 
 30
 To merit judicial enforcement, an award must have a basis that is at least rationally inferable, if not obviously drawn, from the letter or purpose of the collective bargaining agreement. The arbitrator's role is to carry out the aims of the agreement, and his role defines the scope of his authority. When he is no longer carrying out the agreement or when his position cannot be considered in any way rational, he has exceeded his jurisdiction. The requirement that the result of arbitration have "foundation in reason or fact" means that the award must, in some logical way, be derived from the wording or purpose of the contract.
 
 
 31
 415 F.2d at 412. The fifth circuit concluded that the district court had properly inquired into whether the awards were "actually and indisputably without foundation in reason or fact." The court of appeals found, however, that the Board was not outside its jurisdiction, in the sense explained above, in awarding penalty pay, and reversed the district court's decision as to two awards. As to one other award, the court of appeals found that the Board was outside its jurisdiction, because it had improperly calculated the award based on its own formula. "We think that while the Board's announced for determining the sum due to Short was reasonable enough to withstand setting aside, its calculations led to a wholly baseless result." 415 F.2d at 417. The fifth circuit remanded to the Board for a new calculation.
 
 
 32
 The instant case is a far cry from an erroneous calculation of damages. None of the putative precedents even faintly support what the district judge has ordered in this case. A better reasoned judgment would have followed the Second Circuit's opinion in Skidmore v. Consolidated Rail Corp., 619 F.2d 157 (2d Cir. 1979), cert. denied, 449 U.S. 854 (1980). In Skidmore, the Second Circuit rejected the claim that "the NRAB lacks jurisdiction to misinterpret the bargaining agreement." Id. at 159. The court noted that it is specious to say that the N-RAB lacks jurisdiction to make mistakes. In my view, as in the opinion of the Skidmore court, no obvious mi-stake was made in this case; even if it were, it would not affect the jurisdiction of the NRAB, as the district court held it did.
 
 
 33
 The discussion of whether Rule 67 of the present collective bargaining agreement was "adopted unchanged" from Article 36 of the old agreement carries no weight. The arbitration panel flatly decided that there was a change and hence that the 1947 interpretation of the 1945 Memorandum of Understanding was not implicitly a part of the present agreement. I can see no way in which that determination by NRAB can be said not to be "drawn from the essence of the contract," despite that critical phrase's obvious ambiguity.
 
 
 34
 The dispute thus centers on Rule 1, the scope provision. The district court judge and the majority chide the arbitration panel for not discussing this rule, and go on to interpret it themselves, in favor of the railroad. This is exactly what the Supreme Court and distinguished commentators[1] have repeatedly warned against: attempts by the federal judiciary to interpret labor contracts in near-complete ignorance of the "Common law of the particular plant or industry" to which the majority refers.[2] A more acceptable route, given the feelings of the majority and the district court judge that the arbitration panel had not adequately discussed the issue, would have been a remand to the panel for the purpose of such discussion.
 
 
 35
 In this instance, however, I do not believe that a remand would be the best route. The NRAB award should have been affirmed as written. It appears to me that the parties never contemplated that Rule 1 controlled this case until the railroad reached the district court stage. The entire issue was thus not reviewable, because waived below. I do not know how else to explain the railroad's statement in its brief before NRAB:
 
 
 36
 "Rule 1 contains no language of any sort that deals with the "tearing off" function at issue in this dispute. Furthermore, this Board has already held ... that Rule 1 was general in nature and did not describe work to be performed. Quite obviously, then, Rule 1 lends no support at all to the claims found here."
 
 
 37
 (emphasis added). This is quite a change of tune from the claim of the railroad before this court. The railroad now decries the fact that the arbitration panel did not find Rule i dispositive. Apparently, however, the dissenters in the arbitration decision were equally in the dark, for they also failed to mention Rule 1's applicability.[3]
 
 
 38
 BRAC has a colorable claim as to the inapplicability of Rules 1(b) and 1 (c) . The argument comes down to a close textual examination of Rule 1 and a discussion of the meaning of "facility" and "location" in the Rule. It is certainly not the sort of argument that could be resolved by the "cursory reading" that the majority mentions. It is also, in my view, not the sort of interpretational argument that federal courts are supposed to settle in cases arising under the Railway Labor Act.
 
 
 39
 To affirm the district court judge in this case requires this court to say that the Fishgold panel went beyond its jurisdiction in not addressing an issue that arguably is not compelling and was not properly presented to it. I must dissent from such an active judicial role in an area clearly rendered "off limits" to judicial intermeddling.
 
 
 
 [1]
 See, e.g., Cox, Reflections Upon Labor Arbitration, 72 Harv. L. Rev. 1482, 1488 (1959) ("Judges--and sometimes lawyer-arbitrators--are tempted to take refuge in the literal meaning of language when they fail to understand the industrial problem...."); Shulman, Reason, Contract and Law in Labor Relations, 68 Harv. L. Rev. 99, 1024 (1955) ("Arbitration is a means of making collective bargaining work and thus preserving private enterprise in a free government. When it works fairly well, it does not need the sanction of the law of contracts or the law of arbitration. It is only when the system breaks down completely that the courts' aid in these respects is invoked. But the courts cannot, by occasional sporadic decision, restore the parties' continuing relationship; and their intervention in such cases may seriously affect the going systems of self-government.")
 
 
 [2]
 The dangers of novel interpretations by the federal courts have long been recognized. See, e.g., H. Laski, Trade Unions in the New Society 128-29 (1949) ("That there are serious abuses in union practice which stand in serious need of correction I should not for one moment deny. But generally I am disturbed by the view that, unless there has been a plain breach of enacted law, the courts are the proper place in which to correct the abuses.... The smaller the area in which judge-made law decides between the lawful and the unlawful, the better for all concerned. Judicial invasion in this realm is more likely to bring the law into disrepute than in any other.")
 
 
 [3]
 Rule 1 was mentioned at other places in the submissions before NRAB. But a fair explanation of the dissenters' omitting to highlight the rule is that it was never stressed as the centerpiece of this litigation. In their NRAB brief, B & 0 cited Rule 1 again after the language noted above, but only to distinguish the award in the 1980 Kasher decision. BRAC cited Rule 1 to show that its employees were within the scope of the 1973 collective bargaining agreement. It is clear from a detailed inspection of the briefs below that the B & 0 theory of the case was (originally) that Rule 1 had no application, because "the work of 'tearing off' switch lists was never assigned to the abolished clerical positions at Willard to start with."